**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Appellants,**

v.

**Richard E. DAVIS, et al., Appellees.**

**Nos. 90–753, 90–754, 90–755.**

District of Columbia Court of Appeals.

Argued Oct. 17, 1991.
Decided April 3, 1992.

---

Bruce P. Heppen, with whom Robert L. Polk, Arnold I. Melnick and Gerard J. Stief, Washington, D.C., were on the brief, for appellant Washington Metropolitan Transit Authority.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant District of Columbia.

Harry W. Goldberg, with whom Jonathan J. Goldberg and Thomas A. Gentile, Chevy

Chase, Md., were on the brief, for appellee McAdoo.

Robert F. Muse, Washington, D.C., for appellee Davis.

Robert A. Taylor, Jr., Washington, D.C., for appellee Brooks.

Before ROGERS, Chief Judge,
FARRELL and KING, Associate Judges.

ROGERS, Chief Judge:

This case involves a tragic intersection collision between a passenger car and a bus. Washington Metropolitan Area Transit Authority (WMATA) and the District of Columbia contend, on appeal from a judgment in favor of the driver of the car and two car passengers, that there was insufficient evidence of proximate cause, with respect to the speed of the bus as to WMATA, and with respect to the failure to trim shrubbery blocking a stop sign as to the District. The District also contends that the trial judge erred in denying its motions for judgment notwithstanding the verdict since it did not have prior notice that the stop sign at the intersection was obscured by shrubbery. Both appellants contend that the driver of the car was negligent as a matter of law and that the judge erred by not granting their motions for judgment with regard to the judgment of $15,000 in favor of the driver. Finally, both WMATA and the District contend that the trial judge erred by admitting expert testimony on speculative earnings projections regarding appellee Davis.

We hold that the trial judge erred by denying WMATA's motions for judgment notwithstanding the verdict and for a new trial because appellees failed to introduce sufficient evidence of proximate cause. We also hold that the judge erred by not finding that the driver of the car was negligent as a matter of law. While we find no error by the trial judge with regard to the District's contention on notice, we hold, in view of the negligence of the driver of the car, that a new trial is required in response

to the District's argument concerning proximate cause. Accordingly, we reverse the judgments against WMATA and the judgment for the car driver. We also reverse the judgments against the District of Columbia, but we remand for a new trial. In the event of a new trial, we have further concluded that the District would have been entitled to a new trial on appellee Davis' damages.

I

Constance Brooks was driving her daughter and two other children on her way, eventually, to work in the early afternoon of August 20, 1986. As she drove along Otis Street, Northeast, she collided with a Metrobus at the intersection of 18th and Otis Streets. The bus, moving south on 18th Street, had the right of way and had entered the intersection before Ms. Brooks' car passed a stop sign and entered the intersection without stopping. The car hit the center of the Metrobus, spun around and struck the bus a second time towards the rear of the bus. The car then spun away from the bus, hitting the sidewalk curb. Kimberly Davis and Raichelle Hunter were thrown from the car onto the sidewalk. Kimberly Davis died shortly thereafter. Raichelle Hunter sustained several serious injuries, and required a lengthy hospital stay; she remains disabled and disfigured. Ms. Brooks was not hospitalized.

Lawsuits were filed on behalf of Kimberly Davis and Raichelle Hunter against WMATA for the negligence of its bus driver and the District of Columbia for its failure to trim the leaves of the tree obscuring the stop sign, and also against Ms. Brooks for excessive speed and entering an intersection without exercising due care.[1] Ms. Brooks similarly filed suits against WMATA and the District for negligence.

At trial Ms. Brooks testified that she was unaware she was approaching an intersection until it was too late to stop because the trees on the sidewalks and the hedges on

1. Evelyn McAdoo sued, individually and as mother and next friend of Raichelle Hunter, and Richard Davis and Carolyn Lucas, the par-

ents of Kimberly Davis, sued under the wrongful death and survival statutes, D.C.Code §§ 16–2701 *et seq.*, 12–101 (1981).

private property obscured the intersection. She claimed not to see any traffic control signs, and that, although she had been a Metrobus driver for eleven years and had driven bus routes in the immediate area of the collision, she also claimed that she was unaware that there was a stop sign at 18th and Otis Streets. Other witnesses for appellees testified regarding the trees and shrubbery along Otis Street, as well as the faded intersection lines on Otis Street.[2] There was also testimony from the bus driver and bus passengers and a person on the street about the speed of the bus and conduct of the bus driver.

Expert testimony was offered by WMATA regarding whether the accident would have occurred under various assumptions about the speed of the car and the speed of the bus.[3] There also was testimony from area residents that other motorists had previously driven through the intersection without stopping, and that three prior accidents at the intersection had been investigated by the police; one witness described a similar accident in which she was involved two months earlier. A vocational counselor testified over objection about the projected pecuniary losses to the estate of Kimberly Davis based on her obtaining a professional degree as a lawyer, doctor, or engineer.

A jury returned verdicts against WMATA and the District of Columbia finding them jointly and severally liable, and awarding $1,160,430 to the estate of Kimberly Davis, and awarding $100,000, individually, and $2,000,000, to Evelyn McAdoo as mother and next friend of Raichelle Hunter. The jury also returned a verdict in favor of Ms. Brooks for $15,000. The trial judge denied appellants' motions for directed verdict at the close of appellees' case, for judgment notwithstanding the verdict, and for a new trial or remittitur.

## II

WMATA contends that because appellees failed to present expert testimony regarding proximate cause, there was insufficient evidence for the jury to find that the speed of the bus was a proximate cause of the accident and, therefore, that the trial judge erred by denying WMATA's motions for a directed verdict, judgment notwithstanding the verdict, and for a new trial. We agree as to the latter two motions.[4]

Appellees offered evidence from bus passengers and lay witnesses to portions of the accident that the bus driver was driving at a speed in excess of the speed limit and ignored other safety regulations, including the failure to maintain proper lookout and the failure to slow down as he approached an intersection. WMATA, however, presented the expert opinion evidence of Bruce Enz, an expert in accident reconstruction analysis, that unless the bus had been traveling between five and ten miles per hour when it entered the intersection, the bus driver could not have avoided the collision. In other words, the speed of the bus was not the controlling factor.[5] Given

---

**2.** There was testimony that when it rains, as it did on the afternoon of the accident, the branches of the tree, weighed down by rainwater, cover the stop sign.

**3.** The expert, in reaching his conclusions about how the two vehicles came to collide, used police department measurements, photographs and diagrams created by the police, and the deposition testimony of Ms. Brooks and the bus driver.

**4.** Our standard of review is set forth in *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C. 1983) (for directed verdict and judgment notwithstanding verdict, the evidence must be viewed in the light most favorable to nonmoving party), and *Washington v. A & H Garcias Trash Hauling Co.*, 584 A.2d 544, 545 (D.C.1990) (denial of motion for new trial reviewed for

abuse of discretion; trial judge may review all evidence, including witnesses' credibility, offered by both sides).

**5.** In response to a question about what, in his opinion, would have happened if the bus had been traveling 45 miles an hour, Mr. Enz testified that:

the speed of the bus is not the controlling factor. * * * [T]he bus was where it was regardless of its speed, whether it was going ten miles an hour or forty-five miles an hour. So whatever speed it was traveling it was there in the center of the intersection.

He explained that within a ten mile an hour range of his estimate, the speed of the bus would only change where the car would hit the bus or where the car would be struck by the bus.

the length of the skid marks made by Ms. Brooks' car, it was Mr. Enz's opinion that if Ms. Brooks had been traveling 25 miles an hour, the posted speed limit, then the accident would not have occurred because either the bus would have passed through the intersection before the car had entered the intersection, or Ms. Brooks would have had sufficient time to stop before hitting the bus.[6] Had Ms. Brooks been driving 20 miles per hour she also would have had time to stop before reaching the intersection.[7] Mr. Enz estimated that Ms. Brooks was driving 35 miles an hour when she applied her brakes, and between 20 and 25 miles an hour when her car hit the middle of the bus.[8] In his expert opinion, based on his calculations of the speeds of the vehicles and the tree's blockage of the stop sign (and irrespective of rules of the road), the "but for" cause of the collision was the speed of Ms. Brooks' car; had she started to stop at exactly the same place indicated by the skid marks while traveling 25 miles an hour, there would not have been a collision.

Regarding the speed of the bus, Mr. Enz testified that it was not the controlling factor because at the time of the collision the bus was in the center of the intersection and, hence, there was nothing that the bus driver could have done to avoid the accident, unless the bus had been traveling at five to ten miles an hour.[9] Foliage from the trees and hedges along the roadways blocked each driver's view of the other until immediately before entering the intersection. Within a ten miles-per-hour range of his estimate of the speed of the bus, it was his opinion that if the bus had been moving faster, then the car would have hit the bus further to its rear; if the bus had been going slower, the car would have struck the bus in its front or in the front of the side of the bus.[10]

6. The wheels of the car made skid marks that were approximately forty-four feet in length. Mr. Enz testified that if Ms. Brooks had been traveling 25 mph, with a skid mark from only one tire, then her car would have stopped approximately six and one half feet short of impact. If the skid mark came from two tires, then the car still would have avoided hitting the bus; the bus would have been through the intersection because the additional friction of the tires with the road "would have created more time while the car was slowing down." At 25 mph, her skid (from one tire) would have been 38 feet and she would have stopped in the area of the stop sign. Mr. Enz used a 1 to 1½ seconds perception reaction time for an average, unimpaired adult.

7. Mr. Enz testified that had Ms. Brooks been traveling at 20 mph, there would only have been 24 feet of skid, and she would not have entered the intersection.

8. Ms. Brooks' car was completely crushed across the front, and crushed back to the forward position of the wheel well; the front tires were somewhat set rearward, and there was some end shift, as the nose of the car was pulled sideways as a result of the interaction of the two vehicles. WMATA's expert, Mr. Enz, used these data in a computer program in order to determine the speed of the car at impact, 20 to 26 miles an hour. (The damage to the bus, in his view, indicated that the car was traveling at a higher speed.) He concluded that the crush to the front of the car rearward was caused by the speed of the car; the bus was not moving toward the car. Looking at the skid mark length and considering the braking and friction with the roadway surfaces and the fact that the road surfaces were wet, Mr. Enz concluded that the car was traveling between 32 to 37 miles an hour immediately before Ms. Brooks started to apply her brakes.

9. Although Mr. Enz was of the opinion that there was insufficient information to estimate the specific speed of the bus before the collision, he estimated that the bus was "probably pushing thirty miles an hour." This estimate was based on an analysis of the area where Ms. Brooks began to stop (where the stop sign was not visible but where the bus was becoming visible) and the time that elapsed until Ms. Brooks' vehicle collided with the bus, approximately two to two and one half seconds (i.e., the perception reaction time of the driver of the car and the skid time of the car of one second).

10. The wheels of the bus made a skid mark of 34.8 feet after the impact with the car, beginning at 17 feet or so beyond the intersection, ending 51 feet south of the south curb. Mr. Enz did not take into consideration that the bus came to a halt 200 feet past the intersection because there was no way to know if the bus was coasting; he testified that a bus can travel 800 or 900 feet after the driver's foot is off the accelerator. Mr. Enz noted that a bus driver would not slam on the brakes, which could cause injury to the passengers, but instead a bus driver would do periodic braking and let up. Further, Mr. Enz noted that there were limits to the speed of the bus in view of the damage of the front of the car, the car's nose shift and the distance that the car traveled.

As Mr. Enz analyzed what happened after the collision, the bus spun in front of the car, moving counterclockwise, and then the bus continued "essentially straight" until it stopped about 200 feet from the point of the collision. The car, following the initial collision, hit the bus a second time, and then spun approximately three-quarters of a spin and came to rest in the southeast corner of the intersection facing back the way the bus had approached the intersection. In Mr. Enz's opinion, the second hit of the bus by the car—"the secondary slap"—occurred because the car rotated so fast that, before the bus got past the car, the rear end of the car made contact just behind the rear wheel of the left side of the bus. He opined that the initial impact of the car into the bus ultimately caused the car to become attached to the bus, by becoming entangled in a hollow section of the bus.[11] Moreover, Mr. Enz explained that it was the bus speed (which he estimated was within a range of 25 to 30 miles an hour) and the weight of the bus (12 to 13 times that of the car) that caused the car to spin.[12]

■ Proximate cause is generally a factual issue to be resolved by the jury. *See District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984). In intersection collisions, the issue of negligence and proximate cause will almost always be questions of fact to be decided by the jury. *WMATA v. Jones*, 443 A.2d 45, 49–50 (D.C. 1982) (en banc); *Spain v. McNeal*, 337 A.2d 507 (D.C.1975). "The question becomes one of law, however, when the evidence adduced at trial will not support a rational

finding of proximate cause." *District of Columbia v. Freeman, supra*, 477 A.2d at 716; *District of Columbia v. Cassidy, supra* note 4, 465 A.2d at 397–98. Expert testimony is required to establish proximate cause in intersection collision cases when the subject matter at issue is "so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.1978); *District of Columbia v. Freeman, supra*, 477 A.2d at 719 (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C.1982)).

■ Although a jury is generally permitted to infer proximate cause from a driver's unreasonable speed, *see WMATA v. Jones, supra*, 443 A.2d at 50–51, once WMATA introduced expert testimony that the accident could not have been avoided by the bus driver, unless the bus driver had been driving five to ten miles an hour, appellees had to offer evidence that the accident would nonetheless have happened in order for WMATA to be held liable. *See Waugh v. Suburban Club Ginger Ale Co.*, 83 U.S.App.D.C. 226, 167 F.2d 758 (1948). There was no such physical evidence; the evidence showed that the collision occurred at a blind intersection where neither driver could see oncoming traffic. Nor was there expert testimony to support a contrary interpretation of the physical evidence relied on by WMATA's expert. Without such rebutting evidence, there was no rational basis on which the jury could find that the bus driver's excessive speed was a proximate cause of the accident.[13] *Gulf Oil*

---

On cross examination—based on the assumption that the bus had been traveling 25 to 30 miles an hour (or an average of 27.5 miles an hour) after the driver had applied the brakes following the collision, as the driver had testified according to the cross examiner, and the bus skidded 34.8 (i.e., 35) feet—then Mr. Enz calculated that the bus would have been traveling at 36 miles an hour.

11. Mr. Enz testified that after the initial impact, in which the front of the car was crushed by the cross beam of the bus, the car began to rotate, and "the right corner of the car punched through the hollow section of the bus and that went inside and, . . . snagged together for a very brief period of time."

12. Mr. Enz stated that the bus stopped the forward movement of the car, causing the front end of the car to shift sideways, but not to crush it rearward (a different direction of motion).

13. Appellees contend that WMATA's arguments ignore that the bus driver was also negligent for failing to keep a proper lookout and to slow down when approaching an intersection. The bus driver's other alleged negligent acts, however, were directly tied to the speed of the bus. If the bus driver had maintained a proper lookout and had slowed down upon entering the intersection, the evidence was that the bus still could not have avoided the collision. Appellees offered evidence that the vehicles approaching

*Corp. v. Reed,* 118 U.S.App.D.C. 212, 334 F.2d 960 (1964).[14] Expert testimony was required to interpret the skid marks made by the tires of Ms. Brooks' car and the crush pattern to the front of her car in order to determine the speed of her car. *See District of Columbia v. Freeman, supra,* 477 A.2d at 719.

The only expert evidence before the jury was that Ms. Brooks was driving between 32 to 37 miles an hour immediately before she began to apply her brakes based on a computation, starting with an analysis of the crush pattern to the front of her car, which indicated that she was moving at a minimum of 20 and a maximum of 26 miles an hour at the time of impact. WMATA's unrebutted expert evidence, that the only way the bus could have avoided the collision was if it had been traveling five to ten miles per hour, well below the posted speed limit, meant that there was no evidence that could support a reasonable finding by a reasonable jury that even if Ms. Brooks had been driving only 20 or 25 miles an hour, the collision still would have occurred. *See District of Columbia Transit Sys. v. Simpkins,* 367 A.2d 107, 109 (D.C. 1976) (opinion of qualified expert deemed paramount to conclusion of nonexpert witness); *accord, Fred J. Early, Jr., Co. v. Wagner,* 391 A.2d 252, 254 (D.C.1978) (where uncontradicted expert testimony on causation, error to submit issue of permanent injury to jury).

■ Furthermore, assuming appellees were able to overcome the absence of contrary physical evidence and of expert evidence, rebutting or otherwise, regarding the speed of Ms. Brooks' car, expert testimony still would have been required to show that the second hit of the bus by the car was caused by the excessive speed of the bus and not by the speed of the car. Mr. Enz's testimony did not provide appellees with the expert opinion that they needed, namely, that notwithstanding Ms. Brooks' speed in excess of the speed limit as the but-for cause of the collision, it was the excessive speed of the bus that caused the "secondary slap," which, in turn, propelled the children from the car.[15] Nor did the lay evidence suffice since the only relevant evidence was offered by a police officer who testified that he did not address or attempt to determine the actual movements and speeds of the vehicles.[16] Thus, appel-

the intersection from the same directions as the bus and car could not see each other until almost immediately before entering the intersection due to high hedges and trees. Thus, even if the bus driver had maintained a proper lookout and slowed down, he still could not have seen Ms. Brooks' car until a few feet before she reached the corner. But even had he been able to see Ms. Brooks' car prior to entering the intersection, the bus driver was entitled to assume that she would obey the stop sign or yield to the bus, which was on her right side. *See District of Columbia Transit Sys. Inc. v. Carney,* 254 A.2d 402, 404 (D.C.1969). Furthermore, according to WMATA's expert, by the time the bus driver would have been in a position to see Ms. Brooks' car, the vehicles would have been too close to avoid a collision.

**14.** *WMATA v. Jones, supra,* 443 A.2d at 45, did not undermine the persuasiveness of *Gulf Oil Corp. v. Reed,* but simply distinguished it on its facts. *Id.* at 51. In *Gulf Oil Corp. v. Reed, supra,* the court rejected the view that the absence of expert testimony on proximate cause could be overcome by evidence of the defendant's negligence as a result of a violation of a traffic regulation (excessive speed). 118 U.S.App.D.C. at 215, 334 F.2d at 963.

**15.** The jury could not properly rely on Mr. Enz's opinion, based on a hypothetical question on cross examination, that the bus was traveling 36 miles an hour because the hypothetical was based on the false assumption that the bus driver had testified that he was traveling 25 to 30 miles an hour after he had put on his brakes following the collision. *See* note 10, *supra.* In fact, the bus driver testified that he had been moving south on 18th Street at 25 to 30 miles an hour before the collision, and that he was probably going a little slower as he approached the intersection because he had taken his foot off of the accelerator as he approached the intersection. Although the bus driver's estimate of his speed was only an estimate, the bus driver testified at trial that he had been a Metrobus driver for 12 years, and, in his deposition, which was read to the jury, that after driving for so long you become able to identify speeds of vehicles. There was testimony, however, that the bus was on a slight downward incline as it approached the intersection of 18th and Otis Streets.

**16.** Metropolitan Police Officer Clark arrived at the scene after the collision. During the course of describing the photographs that he had taken of the scene, he testified that "my opinion is, as a result of the second impact, when the centrifugal force of the vehicle was spun around and

lees offered no testimony, expert or lay, to support a finding by a reasonable jury that, notwithstanding the intervening cause of the speed of the car, it was the excessive speed of the bus (with or without the bus driver's other violations of traffic regulations) which caused the children to be thrown from the car, and not the speed of the car, which propelled the car into the center of the bus, thereby enabling a second hit of the bus to occur.[17] In view of the complexities of any analysis of the collision, expert opinion, including expert testimony on "occupant kinematics," was required.[18]

Consequently, because there was no evidence on which a jury would rationally find that the collision would have occurred if Ms. Brooks had been driving 20 or 25 miles an hour before braking, the jury could not find that the bus driver's negligence was the proximate cause of appellees' injuries, and the trial judge erred by denying WMATA's motions for judgment notwithstanding the verdict and for a new trial.[19]

### III

The District of Columbia contends that Ms. Brooks was negligent as a matter of law because of her failure to slow down at the intersection or to yield the right of way in violation of traffic regulations designed to prevent the type of collision that occurred, and that her negligence was a proximate cause of the accident. The District also contends that it did not have prior notice that the stop sign at the intersection was obscured by foliage, and in any event, that the District's failure to trim the foliage was not the proximate cause of the collision.

### A

■ It is undisputed that Ms. Brooks' failures to stop at a controlling stop sign and to yield the right of way at an intersection to a bus approaching from her right violated the District of Columbia's traffic regulations, which provide:

When two vehicles enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right.

18 DCMR § 2208.2 (1987). A separate regulation requires a vehicle to stop at a stop sign. *See* 18 DCMR § 2208.3 (1987). Hence, even if there had not been a stop

---

collided with the back of the bus, that it blew out the back window, causing the two children to be thrown through the window." A defense objection to his opinion testimony was sustained. He clarified his view, however, by explaining that "I don't think that the children came out of the vehicle at the point that the second impact was made[;]" "the children were thrown in the tree box space which was quite a number distance in feet away." He stated: although it was "only an assumption on my part—but I would think that when the second contact was made, that shattered the back window and with this—the circular force of the vehicle going around, I think, when they [i.e., the car] came around and they came to the curb, that's probably when the car slid back into the curb, that's probably when the children were ejected." In other words, Officer Clark thought that a third contact, with the curb, after the second contact with the bus, caused the children to be ejected out of the car.

**17.** Officer Clark testified that any movement (more than one mile an hour) by the bus, combined with its weight as compared to the light weight of the car, would have caused the car to spin.

**18.** Mr. Enz explained that he did not examine "occupant kinomatics [sic]," where people move around inside cars in accidents, because occupant kinematics is a factor in the determination of injury mechanics, something on which that he was not focusing.

**19.** Ms. Brooks' attack on the expert's opinion goes to weight, not admissibility. *See In re Melton,* 597 A.2d 892, 904 (D.C.1991) (en banc). In her motion to strike the expert's testimony, Ms. Brooks argued that the investigating police officer's testimony was entitled to greater weight since Mr. Enz had not personally visited the scene and relied on various forms of hearsay and photographs taken less than two hours after the collision. We disagree that this was grounds for striking the expert's testimony. *See District of Columbia Transit Sys. v. Simpkins, supra,* 367 A.2d at 109; *Spain v. McNeal, supra,* 337 A.2d at 511 (expert visited the site two years later); *Mueller v. Cities Service Oil Co.,* 339 F.2d 303 (7th Cir.1964) (expert relied on photograph). Reliance on such expert testimony is also consistent with practice in other jurisdictions. *See Miller v. Pillsbury Co.,* 33 Ill.2d 514, 211 N.E.2d 733 (1965); *Maslankowski v. Beam,* 288 Ala. 254, 259 So.2d 804 (1972).

sign at the intersection, or if the stop sign had been obscured, Ms. Brooks had an obligation to yield the right of way to the bus. It is settled that when a motorist inexcusably fails to yield the right of way at an intersection, in violation of traffic regulations, the motorist is negligent as a matter of law. *See, e.g., Singer v. Doyle,* 236 A.2d 436, 438 (D.C.1967); *Phillips v. District of Columbia Transit Sys. Inc.,* 198 A.2d 740, 741 (D.C.1964). It also is undisputed that Ms. Brooks failed to slow down as she approached the intersection which, the District asserts, violated another traffic regulation. *See* 18 DCMR § 2200.5 (1987). What is disputed, however, is whether Ms. Brooks also was violating the traffic regulation that requires a driver to "drive at an appropriate reduced speed ... when special hazard exists ... by reason of weather." 18 DCMR § 2200.5 (1987).

▉ The presumption of negligence arising from the violation of a traffic regulation is a rebuttable presumption that may be overcome by "sufficient competent evidence to justify a finding that the defendant did all a reasonable person who wished to comply with the law would do." *Leiken v. Wilson,* 445 A.2d 993, 1001 (D.C. 1982); *see also Robinson v. District of Columbia,* 580 A.2d 1255, 1257 (D.C.1990) (*Leiken v. Wilson* "requires that the defendant make a reasonable attempt to *comply with* the law.") (emphasis in original); *Lewis v. WMATA,* 463 A.2d 666, 674 (D.C. 1983) (violation of a safety standard is evidence of negligence, not negligence per se); *Ceco Corp. v. Coleman,* 441 A.2d 940, 945

(D.C.1982) (same). However, more is required than a motorist's claim that he or she did not see a hazard that was plainly there to be seen. *Spain v. McNeal, supra,* 337 A.2d at 510 (driver held contributorily negligent as a matter of law for failing to see what the evidence conclusively shows was there to be seen); *Frager v. Pecot,* 327 A.2d 306, 307 (D.C.1974) (same).

Ms. Brooks offered several explanations of why she did not stop at the stop sign or yield to the bus. First, she testified that she could not see the stop sign. The fact that the sign was obscured by shrubbery was corroborated by other witnesses and photographs taken shortly after the collision. Second, she testified that she did not know that she was approaching an intersection because of the rain and the tunnel effect created by her windshield wipers and the trees on Otis Street. The tunnel effect of the trees also was corroborated by other evidence.[20] Third, she testified that, although she had driven a bus route in the area, she was unfamiliar with that particular intersection. Fourth, she testified that she was driving at a "normal safe speed," had her lights and windshield wipers on since it was raining, and was not in a hurry or engaged in conversation with the children in the car.[21]

Viewing the evidence most favorably to Ms. Brooks, it is clear that her explanation of her conduct was not sufficient "competent evidence" from which a reasonable jury would find that she was not negligent because she had done "everything a reasonably prudent person would have done to

---

**20.** That she admitted failing to notice possible indications that she was approaching an intersection did not necessarily mean, given the distance, obstruction, and rainy weather conditions, that those indicia were visible before Ms. Brooks began to react as soon as she saw something silver through the hedges on her right. But the photographs taken by the police did not make it clear that Ms. Brooks would have been unable to see these indicia. The District points out that the indicia included the change in the road surface from concrete to asphalt, the street signs, the Metrobus sign, a white house on the opposite side of 18th Street, and the street curbs at the corners of the intersections as well as the crosswalk lines. Moreover, there was a school (with a playground) on the north side of Otis Street between 18th and 20th Streets, near the

corner of 18th Street, but Ms. Brooks testified she did not even see it.

**21.** A bystander also testified that Ms. Brooks was driving at the normal speed. Although Ms. Brooks was unsure of exactly how fast she was driving, she did not concede that she was driving 25 miles an hour; rather, she referred, in response to a question about general conditions, to the fact that the normal speed, unless otherwise posted, is twenty-five miles an hour. Metropolitan Police Officer Clark testified that the speed limit on Otis Street was 25 miles an hour, that being the speed limit in the absence of a posted sign to the contrary, and he found no such sign.

comply with all applicable regulations....'' *Leiken v. Wilson, supra,* 445 A.2d at 1003. Her testimony and that of a bystander were unenlightening and imprecise regarding her speed prior to the collision, while there was compelling and uncontradicted expert testimony and physical evidence that her speed before the collision was in excess of 25 miles an hour. Hence, this was not a case in which the jury could ignore the expert's testimony much less the physical evidence. *See Rock Creek Plaza–Woodner, Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983) ("If there are appropriate grounds for disregarding an expert's testimony, the trial court may do so.") (citing *Mann v. Robert C. Marshall, Ltd.,* 227 A.2d 769, 771 (D.C.1967)).

∎ The crash evidence—the police measurements as well as the expert analysis of the crush pattern to the front of Ms. Brooks' car, by which the minimum speed is determined based on the amount of damage to a vehicle, and the place where the bus was hit (left center)—indicated that Ms. Brooks' vehicle was moving between 20 and 25 miles an hour at the time of the collision.[22] The skid marks analysis by the expert indicated that her car was traveling between 32 and 36 miles an hour when she applied her brakes; or 35 miles an hour in the opinion of the expert.[23] Mr. Enz, WMATA's expert witness, testified without contradiction that, under the weather and roadway conditions at the time, Ms. Brooks' car, if driven at 25 miles an hour, would leave a skid mark of 38 feet, i.e., the car would have come to a stop 38 feet after the brakes took hold. The skid marks show, however, that the brakes took hold at a point 44.8 feet from the collision with

the bus.[24] Therefore, if Ms. Brooks had been driving 25 miles an hour and the brakes engaged at the same spot (44 feet from the collision), then her car would have come to a stop six and one half feet short of the bus and there would not have been a collision. That would have been the result at 25 miles an hour. Given the weather conditions, a slower speed might have been more prudent and therefore a stop even farther from the point of collision would have resulted. Moreover, a slower speed was also called for in view of Ms. Brooks' claimed unfamiliarity with Otis Street.

The circumstances as Ms. Brooks described them—the rain, the tunnel effect of the wipers and trees, the hedges on her right side, and her unfamiliarity with the intersection—all required that she drive with caution and be on the lookout for an intersection, particularly since one had not appeared for some time (19th Street does not intersect with Otis Street). Ms. Brooks admitted that she was familiar with the general area of the collision, having previously driven across 18th Street on Monroe Street, which was two blocks south and parallel to Otis Street. Furthermore, because, as a Metrobus driver, she had driven south on 18th Street past Otis Street on the same route (E–2) as the bus driver with whom she collided, no reasonable jury could find that she was unaware she was approaching an intersection. Thus, as the District argues, Ms. Brooks' failure to yield the right of way and to take other precautions as she entered the intersection, as required by the traffic regulations even in the absence of a stop sign, made her negligent as a matter of law.[25] Hence, a rea-

---

**22.** *See* note 8, *supra.*

**23.** The speed would be higher if the skid mark was from only one tire. In Mr. Enz' view, the fact that the car did not spin meant that the brakes were working on both sides of the car. Furthermore, the effect of Ms. Brooks taking her foot off the accelerator and placing it on the brake pedal also would have had the effect of slowing the car (1/10th of a second, or less than 1½ miles an hour).

**24.** The stop sign was 29 to 30 feet from the corner. The point of impact was 11 feet 10 inches from the corner. Thus, the collision was

approximately 42 feet past the stop sign. Hence, at the time the skid marks started, the wheels of Ms. Brooks' car were almost even with the stop sign.

**25.** *See Zeller v. Howard County,* 227 Neb. 667, 419 N.W.2d 654, 656 (1988); *Pepitone v. State Farm Mutual Automobile Ins. Co.,* 369 So.2d 267, 270 (La.App.), *writ denied,* 371 So.2d 1343 (La.1979); *Reidling v. Wickes Lumber & Building Supply Co.,* 471 S.W.2d 319, 321 (Ky.1971) ("T" intersection, where driver had statutory duty to stop even in absence of sign); and *Sullivan v. Herbert,* 225 Tenn. 564, 473 S.W.2d

sonable jury could not conclude that Ms. Brooks had done all she could to comply with the traffic regulation requiring that she yield the right of way. Accordingly, we hold that the trial judge erred by not ruling that Ms. Brooks was negligent as a matter of law, and therefore erred by denying the District's motions for directed verdict, judgment notwithstanding the verdict, and for a new trial.[26]

## B

The District also contends that it did not have notice of the obscured stop sign, and that its failure to trim the tree was not a proximate cause of appellees' injuries because the predominant cause was the conduct of the drivers of the colliding vehicles. Hence, it maintains, the trial judge erred in denying the District's motions for directed verdict, judgment notwithstanding the verdict, and for a new trial.

While the District has a duty to maintain roadways in a reasonably safe condition, it cannot be held liable for injuries caused by a dangerous condition on its streets unless it has notice, actual or constructive, of the condition. *See Mitchell v. District of Columbia*, 120 U.S.App.D.C. 390, 347 F.2d 484 (1965); *District of Columbia v. Pace*, 498 A.2d 226, 231 (D.C. 1985); *Wagshal v. District of Columbia*, 216 A.2d 172 (D.C.1966). But appellees offered evidence not only that residents in the area had notified their Councilmember of the problem concerning the stop sign at the intersection of Otis and 18th Streets, but that the police had investigated three prior accidents at that intersection. Indeed, there had been an accident at the same intersection two months earlier under similar physical conditions, where the driver had explained to the police that he did not see the stop sign.

The District nonetheless contends that it was not on actual notice of the problem with the stop sign. Relying on the evidence offered by the chief of the Tree Maintenance Division and the Supervisor of the Traffic Unit that no complaints had been received about the foliage or the stop sign, it maintains that no member of the executive branch had notice. Of course, constructive notice is sufficient, *Mitchell v. District of Columbia, supra,* 120 U.S.App. D.C. at 391, 347 F.2d at 485, and can be shown by evidence that a street has remained in an unsafe condition for a sufficient period of time that the District authorities ought to have known of it, had they exercised ordinary care. *District of Columbia v. Woodbury,* 136 U.S. 450, 10 S.Ct. 990, 34 L.Ed. 472 (1890); *Jones v. District of Columbia,* 123 A.2d 364, 366 (D.C.1956); *see also Aben v. District of Columbia,* 95 U.S.App.D.C. 237, 221 F.2d 110 (1955); *Lyons v. District of Columbia,* 93 U.S.App.D.C. 278, 214 F.2d 203 (1954); *Smith v. District of Columbia,* 89 U.S.App.D.C. 7, 189 F.2d 671 (1951). Nine area residents offered testimony regarding the long-term existence of the foliage problem for a period of at least two years.

The District cites no authority for the proposition that failure to notify the offices of the Tree Maintenance Division or the Traffic Unit means that the District government cannot be found to have had actual or constructive notice of foliage and

453, 455 (1971), holding in general that the failure to yield is an independent legal obligation of motorists despite the absence of a warning or stop sign. *See Brown v. Merz,* 429 So.2d 463, 465 (La.App. 4th Cir.) (explaining that in *Pepitone, supra,* "it was important to our reasoning that there must exist no factors which might induce a motorist to falsely believe that the street on which he is traveling is superior to the intersecting street, for if he *reasonably* perceived that the intersection was *controlled in his favor,* then the motorist certainly would have fallen into a trap.") (emphasis in original), *writ*

*denied,* 435 So.2d 434, *writ denied,* 435 So.2d 448 (1983).

**26.** We need not reach the District's contention that Ms. Brooks' violation of the applicable traffic regulations was not excused under the standards set forth in the RESTATEMENT (SECOND) OF TORTS, § 288A (1965). Under those standards, a violation of a regulation may be excused if the violator "neither knows nor should know of the occasion for compliance." Section 288A also excuses noncompliance where the person is "confronted by an emergency not due to his [or her] own misconduct." § 288A(2)(d).

stop sign problems as a result of notice to other sources within the District government. Moreover, its own witness, the chief of the Tree Maintenance Division, testified that the police department also "constantly" looks at obstructions to traffic devices, including stop signs.

That the condition was, the District argues, a partial obscuring occurring intermittently over a two-year period is not dispositive. See District of Columbia v. Wood, 41 App.D.C. 101 (1913) (constructive notice depends on whether defect is obvious or latent); 19 McQUILLEN, MUNICIPAL CORPORATIONS § 54.111 (3d ed. 1985) (constructive notice based on whether latent defect not manifesting dangerous condition could have been known by exercise of reasonable care). Evidence of other accidents occurring at the same intersection is generally admissible to show notice of the hazardous condition when the injury at issue was allegedly caused by the same hazardous condition under similar circumstances. See District of Columbia v. Doe, 524 A.2d 30, 34–35 (D.C.1987) (evidence of prior incidents generally admissible to show defendant's notice or knowledge of dangerous condition, but prior incident must have occurred under similar circumstances to be deemed relevant); Hackett v. District of Columbia, 264 A.2d 298, 299 (D.C.1970); Edwards v. Consolidated Rail Corp., 567 F.Supp. 1087, 1105 (D.D.C.1983) ("Evidence of prior accidents is generally admissible in the District of Columbia 'to show defendant's notice or knowledge of the … dangerous condition [that] caused the accident.'" (citation omitted)), aff'd, 236 U.S.App.D.C. 135, 733 F.2d 966, cert. denied, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984). Appellees introduced evidence of similar collisions which were investigated by the police, and also instances in which motorists drove through the intersection without stopping, just barely avoiding a collision.[27]

▮ Finally, once the District installs a traffic safety control device, it has a duty to maintain the device in a reasonably safe condition. See, e.g., District of Columbia v. Pace, supra, 498 A.2d at 230; Wagshal v. District of Columbia, supra, 216 A.2d at 173–74; Jones v. District of Columbia, supra, 123 A.2d at 364. A stop sign is such a device. District of Columbia v. Freeman, supra, 477 A.2d at 716–17 (discussing Wagshal v. District of Columbia, supra, 216 A.2d at 173–75). In the instant case, appellees offered evidence from which the jury could reasonably find that the District allowed the stop sign and the intersection to deteriorate from their original design. District of Columbia v. Pace, supra, 498 A.2d at 231; see also Husovsky v. United States, 191 U.S.App.D.C. 242, 253, 590 F.2d 944, 955 (1978). In Wagshal v. District of Columbia, supra, 216 A.2d at 174, involving an intersection accident where a stop sign had been knocked down, the court observed that "[t]he absence of the sign in the place where it had stood for a considerable time created an unsafe condition every bit as dangerous as a hole in the roadway."

▮ That the District had notice of the obscured stop sign did not, however, also mean that its negligence in failing to trim the tree was a proximate cause of the collision. At trial the District argued to the jury that its negligence was not a substantial factor, in view of the conduct of Ms. Brooks and the bus driver, and alternatively, that even if the blocked stop sign was a substantial factor, the drivers' conduct was an intervening cause. On appeal

27. The District's reliance on decisions that notice to police officer is not notice to a municipality, is misplaced in light of the testimony of the chief of the Tree Maintenance Division regarding the police department's activity in checking for obstructed traffic signs. 19 McQUILLAN, MUNICIPAL CORPORATIONS § 54.106a (3d ed. 1985) ("Notice to a policeman is ordinarily not notice to the municipality, except where he is charged with the duty of remedying or reporting defects."). See 63 C.J.S. MUNICIPAL CORPORATIONS § 833(d) (1950) (notice to police officer who is accustomed to reporting defects, which custom is recognized by authorities, is notice to municipality), cited in Mockosher v. City of Shreveport, 155 So.2d 438 (La.App.1963); see also Sobel v. City of New York, 178 N.Y.S.2d 821 (1958) (notice to police officer is notice to a municipality); Randolph v. City of Chicago, 315 Ill.App. 85, 42 N.E.2d 143, 145 (1942) (same); City of Knoxville v. Ferguson, 241 S.W.2d 612, 614 (Tenn.1951) (same).

the District maintains that the intersection imposed a duty on both of the drivers to slow down regardless of whether there was a stop sign at the intersection.[28] In view of our conclusion that the trial judge erred by not ruling that Ms. Brooks was negligent as a matter of law, we agree with the District's contention that "without the negligence of Ms. Brooks in the equation, the jury had a defective basis to assess the relative effect of the District's failure to trim the tree on the cause of the injuries." Accordingly, we hold that the trial judge erred by denying the District's motion for a new trial. *Accord, Bell v. Westinghouse Electric Corp.*, 483 A.2d 324, 328–29 (D.C. 1984) (in reversing grant of new trial, court distinguished between prejudicial legal error and loss of a tactical benefit in the proceedings, the former but not the latter being a basis for a new trial); *see Eastern Airlines v. Union Trust Co.*, 99 U.S.App. D.C. 205, 209, 239 F.2d 25, 29 (1956) (judge's duty differs in ruling on motion for directed verdict and motion for new trial), *cert. denied*, 353 U.S. 942, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957).

## IV

■ Finally, in view of the possibility of a new trial, we address the District's contention that it was entitled to a new trial on damages for the death of Kimberly Davis because the trial judge erred by allowing expert testimony based on an unsupported assumption about professional status. Relying on the factors that must be considered in projecting lost earnings of a child set forth in *Hughes v. Pender*, 391 A.2d 259, 263 (D.C.1978), the District maintains that Joseph Rose, a vocational evaluation counselor, and Richard Lurito, an economist with whom Mr. Rose conferred, assumed professional attainment by Ms. Davis in the absence of any evidence to support that assumption. The District points to the evidence that her school teacher testified that she was a C-average student, that her father, an electrician, was

only a high school graduate, that her mother had completed only the 12th grade and one year of another school, and that an older brother had expressed interest in a military career.

In *Gilborges v. Wallace*, 153 N.J.Super. 121, 379 A.2d 269 (1977), *aff'd*, 78 N.J. 342, 396 A.2d 338, 343 (1978), the court ordered a new trial on damages where the estimated lost earnings of a high school senior included potential lost earnings as a veterinarian, a field in which the student had expressed some interest, concluding that while there was sufficient evidence from which the jury might find that the student would have been a college graduate, there was no factual basis in the record that she would become a veterinarian. 379 A.2d at 277; *Gilborges v. Wallace, supra*, 379 A.2d at 343 (based almost on pure speculation); *see also Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984); *Johnson v. Serra*, 521 F.2d 1289, 1293 (8th Cir.1975) (trial judge abused discretion in admitting expert testimony on pecuniary loss because too speculative and conjectural); *Shackman v. Daigle*, 447 So.2d 629, 631 (La.App.1984); *Meyer v. Stone*, 6 Kan. App.2d 254, 627 P.2d 1155 (1981); *Watson v. Hartford Accident & Indemnity Co.*, 339 So.2d 480 (La.App.1976), *writ denied*, 341 So.2d 1124 (La.1977).

Likewise here, we conclude that Ms. Davis' attainment of professional status was without sufficient evidence in the record. Dr. Lurito did not speak with Ms. Davis' parents, teachers, or review her school reports, and yet based his economic projection for this nine-year old on the assumption that she would become a professional, either a doctor, lawyer or engineer, and achieve a GS 16 grade level in the federal government. He relied heavily on Mr. Rose's opinion.

Appellee Davis concedes that Mr. Rose did not consider general demographic statistics in making his projections, and that Ms. Davis had expressed interest in a varie-

---

**28.** The District relies on decisions from a number of other jurisdictions. *See, e.g., Zeller v. Howard County, supra* note 25, 227 Neb. at 673–75, 419 N.W.2d at 659; *Pepitone v. State Farm Mutual Automobile Insurance Co., supra* note 25, 369 So.2d 267; *Reidling v. Wickes Lumber & Building Supply Co., supra* note 25, 471 S.W.2d 319.

ty of careers, including less well-paid careers, such as teaching and becoming a police officer. *See Hughes v. Pender, supra,* 391 A.2d at 262 (exclusion of higher income projections because not based on accurate probability decedent would have entered those professions). Nor did appellee Davis challenge the statistical evidence that only one out of every 200 women graduate from professional school, arguing instead to the jury that it should ignore statistics.

To testify as an expert, Mr. Rose was required to offer some authoritative source for his opinion that Ms. Davis would have been the one among 200 women to graduate from graduate school; otherwise, he was simply giving a personal opinion. *See Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C.1988) (where expert testimony required, insufficient if it consists merely of the expert's personal opinions unsupported by written standards or authorities); *Ventura v. Winegardner,* 178 W.Va. 82, 357 S.E.2d 764 (1987); *Greater Richmond Transit Co. v. Wilkerson,* 242 Va. 65, 406 S.E.2d 28 (1991) (testimony of future lost income only reliable if "grounded upon facts specific to the individual whose loss is being calculated"). Nothing in his representations of his conversations with Ms. Davis' family and school teacher shows that they supported his assessment of her future achievements. Her C-level grades hardly offered compelling evidence of intellectual curiosity and an interest in reading alone suggested little more than a very generalized basis for hoping that she might have attained professional status. Nor was there any indication that anyone in her extended family had completed college.

"[T]he task of projecting a person's lost earnings lends itself to clarification by expert testimony, because it involves the use of statistical techniques and requires a broad knowledge of economics." *District of Columbia v. Barriteau,* 399 A.2d 563, 568 (D.C.1979) (quoting *Hughes v. Pender,*

*supra,* 391 A.2d at 262). The issue raised by the District is not whether Ms. Davis might have become a professional had she lived. Rather, the only issue is whether there was a proper foundation for the expert's conclusion that she would. Because Mr. Rose's judgment about Ms. Davis' professional attainment was subjective, rather than scientific or expert in nature, his testimony was inadmissible. *Dyas v. United States,* 376 A.2d 827, 832 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *see Curry v. Giant Food Co.,* 522 A.2d 1283, 1291 (D.C.1987). *Clifford v. United States,* 532 A.2d 628, 639 (D.C. 1987), on which appellee Davis relies, is not to the contrary.[29] Accordingly, the trial judge erred by denying the District's motion for a new trial on appellee Davis' damages.[30]

In conclusion, we reverse the judgments against WMATA and the District, including the judgment for Ms. Brooks; as to the District of Columbia we remand the case for a new trial.

FARRELL, Associate Judge, concurring:

I agree with the majority that the trial judge should have entered judgment as a matter of law in favor of WMATA, that plaintiff Brooks was contributorily negligent as a matter of law, and that the District of Columbia is entitled to a new trial on both liability and damages. I write briefly only to state my understanding of why plaintiffs' case against WMATA failed.

The issue is troublesome, for there was abundant evidence from which the jury could find that the WMATA bus driver was traveling negligently—even recklessly—well in excess of the speed limit down the busy thoroughfare of 18th Street. As one bus passenger described it:

> We started going real fast, flying like I call it, going down—right there at 18th and South Dakota Avenue ... and then

---

**29.** We need not reach the question whether the trial judge erred by permitting Mr. Rose to be qualified as an expert in vocational evaluation rehabilitation over objections by WMATA and the District.

**30.** WMATA's cross claim against the District and Ms. Brooks for contribution remains open. *See Ceco Corp. v. Coleman, supra,* 441 A.2d at 951.

we taken up a little more speed going down there by Otis Street at the intersection there ... I said, "I want to get home, but I don't want to get home this fast."

One eyewitness testified that the bus had not reduced speed before entering the intersection. Even after the collision, the bus did not come to a stop until it was 200 feet past the south curb of the intersection.

The court does not question this evidence of a gross deviation from the standard of ordinary care by the bus driver, but concludes that plaintiffs' case against WMATA failed on the issue of causation—at least after WMATA's expert Bruce Enz testified about the lack of causation. The essence of Enz's opinion is contained in the following testimony:

> ⸜Well, the speed of the bus is not the controlling factor. I mean the bus was where it was regardless of its speed, whether it was going ten miles an hour or forty-five miles an hour. So whatever speed it was traveling, it was there in the center of the intersection, and there's nothing that the operator of the bus could have done, unless the bus was traveling maybe five or ten miles an hour, but anything above that there's really nothing the bus operator can do to avoid this accident.
>
> \*     \*     \*     \*     \*     \*
>
> [The bus] was going a speed when the accident happened. We know that. If it was going faster than that speed, then the car would have struck it further to the rear of the bus. If it had been going somewhat slower than that speed the car would have struck it in front of the bus or in front of the side.

In essence Enz testified that, unless the bus driver had been traveling under ten miles per hour when he entered the intersection (the speed limit was twenty-five), he simply could not have avoided being struck somewhere by Ms. Brooks's car. As the court points out, plaintiffs presented no contrary expert testimony that—again measured from the point when the bus driver entered the intersection—he still could have slowed down or taken other action to avoid the collision if he had been driving at a proper rate of speed. Hence the driver did not proximately cause an accident which, according to Enz's uncontradicted testimony, he could not have avoided even by the exercise of due care.

Enz, however, as I understand his testimony, expressed an opinion only as to the ability of the bus to avoid the collision once it *entered* the intersection where the accident occurred. A legitimate question arises whether the excessive speed of the bus causally contributed to the accident in that, had the bus driver been traveling at a lesser speed down 18th Street and keeping a more cautious lookout, he might have had an expanded *zone of opportunity* in which to react to sighting Brooks's car as it entered the intersection.

On the evidence presented, the jury could reasonably find that the bus had been traveling at a greatly excessive speed for at least the length of a city block or more. The jury could also fairly infer, in my view, that had the bus been going at or under the speed limit for that distance (as the weather conditions reasonably might require), it would not even have reached the intersection when Brooks's car came through the stop sign—it would still have been further up 18th Street—and hence the collision would not have occurred. So far as I can discern, however, this notion of causation has been uniformly rejected by the courts. That is, the fact that the defendant's negligence *brought him to the place* where he could not avoid the accident, so that "but for" the negligence there would have been no accident, is insufficient to establish proximate causation. As one court has stated addressing a claim of contributory negligence: "Generally, ... negligence which does no more than place the plaintiff at the place of the accident is not sufficient to bar recovery. Plaintiff's negligence ... was 'remote' in law even though close in time." *Graft v. Crooker*, 263 F.Supp. 941, 942 (D.Mont.1967); *see Underwood v. Fultz*, 331 P.2d 375, 379 (Okl.1958) ("The speed, therefore, considered by itself, may have been a condition of the accident, but it was quite removed in the chain of causa-

tion"); HARPER, JAMES, & GRAY, THE LAW OF TORTS § 20.5, at 141 (2d ed. 1986).[1] This same reasoning is implicit in the result and analysis in a decision binding on this panel, *Gulf Oil Corp. v. Reed*, 118 U.S.App.D.C. 212, 334 F.2d 960 (1964) (uncontradicted evidence showed that accident occurred the moment child stepped from behind concrete wall into path of speeding truck; no discussion of fact that lower speed might have brought truck to place at later time).

In short, the rule is that "[s]omething more must appear in order that it may be said that the speed of the [bus] contributed to the accident...." *Underwood v. Fultz*, 331 P.2d at 379. That "something more" must essentially amount to an *expanded opportunity* which the driver could have secured for himself at a lower speed to see the other vehicle approaching the intersection and take evasive action. *See, e.g., Hobbs v. Boston & M.R.R.*, 184 A. 355, 356 (N.H.1936) ("Under a legal rate of speed the plaintiff would have been 50 feet from the crossing when the train passed over it. The train would have been directly ahead of him in his almost inescapable view"). In my judgment, the failure in plaintiffs' case against WMATA is the total absence of evidence in this record that the bus driver, if traveling at a lower rate of speed, could have seen Ms. Brooks's car from a vantage point farther up 18th Street. The unsolvable difficulty of proof plaintiffs faced is that this was essentially a case of a blind intersection. No testimony by Officer Clark or anyone else permitted a rational inference that the bus driver could have seen a car entering the intersection at a right angle from farther up 18th Street, or before the point at which he in fact saw the car. Had there been such evidence, I am not convinced that plaintiffs would have needed expert testimony to establish an inference that a slower rate of speed by the bus would have enabled it to avoid the collision. *See Davis v. Brooks Transp. Co.*, 186 F.Supp. 366, 369 (D.Del.1960) (where plaintiff's car ran stop sign and struck the side of defendant's truck, court ruled "it would be invading the province of a jury to hold that, as a matter of law, [defendant] was under no duty to have seen plaintiffs' car and appreciated the danger sooner"). I am thus not persuaded that the gap in plaintiffs' proof was ultimately the failure to adduce expert testimony. Rather, they simply presented *no* proof that a lower rate of speed and more cautious attention to the road and side streets ahead would have enabled the bus driver to see Brooks's car early enough to avoid the collision. *See Nesta v. Meyer*, 100 N.J.Super. 434, 242 A.2d 386, 394–95 (App.Div.1968) (jury could find plaintiff contributorily negligent because it could have concluded that his speed while passing was related to his failure to observe defendant's turn signal and decreased his ability to control his vehicle when defendant's car moved to the left).

This seems on the one hand a harsh result because, under modern traffic conditions, one would expect that for a prudent bus driver, the negligence of someone like Brooks in entering the intersection without stopping would be foreseeable. *But see Washington Metro. Area Transit Auth. v. Jones*, 443 A.2d 45, 50 n. 5 (D.C.1982) (en banc) ("favored driver [under] no duty to anticipate that another vehicle would ignore the stop sign and proceed directly into the intersection"). We can reasonably expect bus drivers "to maintain a proper lookout and exercise reasonable care in entering an intersection," *id.*, especially when they know or should know the thoroughfare has blind intersections, RESTATEMENT

---

1. These commentators suggest that the issue is more properly analyzed not as one of causation but as a question of the scope of the duty which the defendant owes the plaintiff:

 [I]f [in a given hypothetical] defendant had been driving more slowly before the accident, he would not have been at the point of collision when the child was there, so that there would have been no accident. Does that establish causal relation between wrong and injury? Presumably not, but if not, that is because the prohibition against speed is not for the purpose of keeping people from being at a certain place at a certain time, but rather to prevent loss of control. Thus one is thrown back on the ... inquiry into the scope of duty and the purpose of the rule of conduct...."

HARPER, JAMES, & GRAY, *supra*, § 20.5, at 141–42 n. 18.

(SECOND) OF TORTS § 289 comment f, illus. 4 (1965); and it is not enough for the driver to assert merely that he had the "right of way." *See, e.g., District of Columbia Transit System v. Harris,* 284 A.2d 277 (D.C.1971). Still, if we are going to require proximate causation, as we must, then there must be some sense in which the bus driver's speed or failure to keep a lookout can be said to have enhanced the risk that a car running a stop sign would collide with his vehicle. On the facts of this case, in which the bus driver could control the time of his arrival at the intersection but not the point at which he could see a car entering from the side street, his arrival at the exact moment of collision was legally fortuitous and his recklessness, except in the barest sense of "but for" causation, cannot be said to have contributed to the risk that Brooks and the children in her car would be injured.

I therefore reluctantly join the conclusion that WMATA's liability cannot be sustained.