**DISTRICT OF COLUMBIA, Appellant,**

v.

**Carlton PACE, et al., Appellees.**

**John DAWSON, Appellant,**

v.

**DISTRICT OF COLUMBIA, et al., Appellees.**

**Nos. 83–676, 83–677.**

District of Columbia Court of Appeals.

Argued Feb. 19, 1985.

Decided Sept. 19, 1985.

As Amended Oct. 4, 1985.

---

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia.

Richard G. Moore, Washington, D.C., with whom Stephen G. Cochran, Washington, D.C., was on the brief, for appellee Carlton Pace.

Dwight D. Murray, Washington, D.C., was on the brief for Eddie Pace. Bernadette Gartrell, Washington, D.C., was on the brief for Calhoun and Dawson.

Before NEBEKER, FERREN and TERRY, Associate Judges.

NEBEKER, Associate Judge:

The District of Columbia (District) appeals from the trial court's order denying its motion for judgment notwithstanding

the verdict or a new trial. Following a jury trial of four consolidated negligence actions, which arose from an automobile accident, the trial court entered judgment against the District for $350,000.[1] The theory of liability on which appellees recovered was threefold: that the District had negligently (1) designed a barrier and ramp on the Southeast Freeway; (2) failed to improve them; and (3) failed to maintain them. On appeal, the District contends that it is immune from liability for its discretionary decisions respecting freeway design and priorities for improving highways. It also asserts that the evidence showed that the freeway was well maintained. We agree and accordingly reverse.

I

On July 2, 1978, appellees Carlton and Eddie Pace and Sherrye Calhoun, as well as John Dawson's decedent Rolene Dawson, were traveling westward on the Southeast Freeway in the Paces' automobile. An automobile operated by William Marin entered the Freeway from the Third Street ramp as appellees approached it. When Mr. Marin drove up the ramp, the car in front of him slowed down before entering the Freeway. Rather than slowing down behind that car, Mr. Marin drove through a guard area designed to prevent such entries, crossed two lanes of traffic, and hit the rear of the Paces' automobile. The Paces' car went out of control, struck another car, vaulted over a metal guardrail, and fell approximately forty feet to the street below.

Following this accident, appellees Pace and Calhoun sued both the driver and owner of the car that hit them, as well as the District, for personal injuries. Rolene Dawson was killed in the accident, and John Dawson, her personal representative, sued only the District, as the car owner's

insurer settled with him. Appellees contend that the bridge guardrail was designed in such a way as to have caused their automobile to vault over it upon impact. They further claimed that this problem became known to highway experts several years after the Freeway's construction and that the District should have then redesigned the barrier. Regarding the Third Street ramp, appellees asserted that it was too short and too close to the exit ramp to the Capitol, thereby creating an unsafe condition.

Throughout the proceedings, the District maintained that its decisions concerning freeway design and improvements are discretionary, but the trial court disagreed, instead instructing the jury that the District has a duty to maintain the streets in a reasonably safe condition. The court further instructed that in determining whether the District had met that duty, the jury could consider the original design and subsequent maintenance of the Freeway.

II

▮ The principles of sovereign immunity are well established in the District. *Rustin v. District of Columbia*, 491 A.2d 496, 500 (D.C.1985). Under this doctrine, the District is immune from suit in tort if the act complained of was committed in the exercise of a discretionary function. *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C.1973) (en banc). But where the District's conduct arises out of the exercise of ministerial powers, "there is a duty to act in a reasonably safe and skillful manner." *Wagshal v. District of Columbia*, 216 A.2d 172, 173 (D.C.1966).

▮ Ministerial acts are those which reflect "the execution of policy as distinct from its formulation." *Elgin v. District of Columbia*, 119 U.S.App.D.C. 116, 118–19,

---

1. The jury verdicts totaled $400,000, but the trial court gave the District a fifty percent credit on the $100,000 judgment in favor of John Dawson. The credit was based on a settlement with William Marin and Jay Mills, respectively the driver and owner of the automobile. Dawson appealed from the order granting the credit, and that appeal has been consolidated with those taken by the District. We need not reach the question of the credit, in view of our holding in favor of the District.

337 F.2d 152, 154–55 (1964). Discretionary functions, on the other hand, involve policy determinations, where "no statutory or regulatory requirements [limit] the exercise of policy discretion." *Chandler v. District of Columbia*, 404 A.2d 964, 966 (D.C. 1979). Discretionary decisions typically affect large numbers of people and "call for a delicate balancing of competing considerations." *Owen v. Independence*, 445 U.S. 622, 648, 100 S.Ct. 1398, 1414, 63 L.Ed.2d 673 (1980). The common-law distinction between ministerial and discretionary functions arose out of a concern for separation of powers. *Id.* Immunity is vital in the context of discretionary functions because of the necessity and desirability of "freeing policy decisions from jury speculation." *Chandler, supra,* 404 A.2d at 966. In other words, allowing a court or jury to "[invade] the legitimate sphere of [a] municipality's policymaking processes" would infringe upon the powers properly vested in a coequal branch of government. *Owen, supra,* 445 U.S. at 648, 100 S.Ct. at 1414.

■ Applying these precepts to the facts at hand, we conclude that freeway planning and design are discretionary functions. The general principle of design immunity has been established in the District for close to a century. *See Johnston v. District of Columbia*, 118 U.S. 19, 20–21, 6 S.Ct. 923, 923–24, 30 L.Ed. 75 (1886) (District is immune from suit respecting the planning and design of sewers). Turning specifically to street design, we note that decisions surrounding freeway construction are complex, involving the consideration of many competing factors and large expenditures of scarce resources. This court has stated previously that street design is a discretionary function which insulates the District from liability. *District of Columbia v. North Washington Neighbors, Inc.*, 367 A.2d 143, 148 n. 7 (1976), *cert. denied,*

434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). Similarly, in *Urow v. District of Columbia*, 114 U.S.App.D.C. 350, 316 F.2d 351, *cert. denied,* 375 U.S. 826, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963), the court held that decisions regarding the placement of traffic control devices, one aspect of street design, are discretionary. In explaining the basis for its conclusion, the court emphasized that "[t]he establishment of … a general traffic control plan is essentially legislative in nature." *Id.* at 352. Finally, the Supreme Court has defined discretionary acts as those including "determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953). Street design falls squarely within the ambit of this definition.

The District contends that decisions concerning not only freeway design but also freeway improvements are discretionary in nature. We agree. To hold otherwise would be effectively to impose a legal duty on the District to have "state-of-the-art" streets. Neither courts nor juries can dictate ad hoc policy in this aspect of government. The implementation of evolving engineering standards is costly, requiring the allocation of limited governmental funds through a system of priorities. Imposing a duty to implement the latest engineering standards would create a prohibitive burden on the District and its taxpayers. Further, long-term planning in this area is essential but would be thwarted entirely if it became the frequent subject of litigation.

The District's decision on whether to establish a plan of improvement is within the area protected by sovereign immunity. *Wagshal v. District of Columbia, supra,* 216 A.2d at 173.[2] Underlying this rule is

---

**2.** Our holding is buttressed by the fact that the District has implemented a system to identify hazardous street locations and to set priorities among them for improvements. This system, which conforms to both local and federal requirements, produces an annual list of 200 locations for design modification. Ordinarily, funding is appropriated for work on the top 20 sites. The place where the accident in this case occurred was number 121 on the modification list

the principle that the city's setting of priorities so that its limited resources can be most effectively allocated to protect the public is a matter of discretion. *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C.1983) (en banc); *Chandler v. District of Columbia, supra*, 404 A.2d at 964 (District's closing fire stations on a rotating basis to save money was a discretionary act). There is no reason to believe that the laymen on a jury are better qualified than the District's experts to render a decision on these matters. *Chandler, supra*, 404 A.2d at 966.

### III

Finally, appellants claim that a directed verdict should have been granted on appellees' claim of inadequate maintenance, as there was no evidence that the Freeway had been allowed to deteriorate. They aver that "[a]ppellees' allegations of improper maintenance were an impermissible recasting of their real claims concerning faulty design and failure to improve."

■ We begin with the proposition that the District does have a ministerial duty to maintain its streets and highways. *See, e.g., Wagshal v. District of Columbia, supra*, 216 A.2d at 173. However, it "is not an insurer of the safety of travelers upon its streets and is only required to maintain ... roadways in a reasonably safe condition." *District of Columbia v. Williams*, 46 A.2d 111, 112 (D.C.1946). The disagreement between the parties on this issue centers largely around the meaning to be afforded the word "maintain" in this context. The District advocates a narrow definition, arguing that maintenance defects involve physical deterioration such as potholes. More accurately, maintenance entails only keeping a road in such a condition as to conform with its original design. Appellees, on the other hand, assert that maintenance "encompasses a continuous obligation to reasonably warn travelers against or protect them from any known

unsafe or dangerous condition in, of or upon the roadway." Pace's brief at 24, adopted by other appellees.

We agree with the meaning that the District attaches to the word "maintain," which is consistent with the dictionary's definition—"to keep in a state of repair." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1362 (1971). This view conforms to the Supreme Court's language in *Johnston v. District of Columbia, supra*, 118 U.S. at 19, 6 S.Ct. at 923. In discussing the question of discretionary versus ministerial acts respecting a municipal sewer, the Court noted that planning and design are discretionary functions. But "for any negligence in ... keeping it in repair ... the municipality ... may be sued...." *Id.* at 21, 6 S.Ct. at 924.

Both the trial court and appellees place primary emphasis on language in *District of Columbia v. Caton*, 48 App.D.C. 96 (1918), to support their broad interpretation of what is encompassed by the word "maintain." In *Caton*, the Court of Appeals stated the following:

> Having adopted a plan and created an existing condition on the street in pursuance thereof, if it subsequently appears that the condition thus created renders the street unsafe, the District must go further and perform the duty cast upon it, to exercise ordinary care and take the necessary additional steps to make the street, thus encumbered with the product of its plan, reasonably safe for travel.

*Id.* at 106. Despite the court's use of broad language here, we do not believe that it can be interpreted in the sweeping fashion which appellees advocate. To the contrary, the court specifically relied on and analogized to two earlier cases that defined "maintenance" in a narrower fashion. In *Finney v. District of Columbia*, 47 App.D.C. 48 (1917), the court, in deter-

in 1976. The 1977 list had not been prepared at          the time of the accident.

mining the District's duties concerning a tree space within a sidewalk, asserted that "if ... through neglect the space had become dangerous, then the duty of the District would be the same as that imposed upon it with respect to any condition of the street or sidewalk which is permitted to become a menace to the safety of persons traveling thereon." *Id.* at 52. Similarly, in analyzing the District's duties regarding a hitching post, the court emphasized that while "[a] hitching post is a lawful obstruction, ... the city would in this case be liable for any defect in this post arising from want of proper supervision...." *District of Columbia v. Duryee,* 29 App. D.C. 327, 334 (1907).

■ Later decisions by this court lend further support to our view that street maintenance means keeping the roadway and its physical appurtenances in good condition, according to their original design. For example, in *Wagshal v. District of Columbia, supra,* 216 A.2d 172, this court held that the city's failure to repair a downed stop sign constituted actionable negligence. The court reasoned that "[t]he District need not have put up the sign, but once it did, it had a duty to maintain it properly in order to keep the intersection reasonably safe for motorists." *Id.* at 174; *see also District of Columbia v. Freeman,* 477 A.2d 713, 715 (D.C.1984).

■ Mindful of our definition of maintenance, we have reviewed the record and agree with the District that appellees offered no evidence that the Freeway had been permitted to deteriorate from its original design. The only testimony concerning maintenance was that of the city's expert, who stated that the pertinent parts of the Freeway looked to be in "remarkably good condition."

Accordingly, we reverse and order that judgment be entered in favor of the District of Columbia on all counts.

*So ordered.*