Michael E. TUCCI and Amy C. Tucci, Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 06–CV–1344.

District of Columbia Court of Appeals.

Argued Feb. 22, 2008.

Decided Sept. 18, 2008.

Michael E. Tucci, Washington, for appellants.

Catherine Ferrando, Assistant Attorney General, with whom Linda Singer, Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, Edward E. Schwab, Deputy Solicitor General at the time, and Karen A. Weiss, Assistant Attorney General at the time, were on the brief, for appellee.

Before FISHER, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

FISHER, Associate Judge:

Appellants Michael and Amy Tucci sued the District of Columbia for "Maintenance of a Public Nuisance" and "Refusal to Enforce Municipal Regulations and Other Laws." They now appeal an order of the Superior Court which granted summary judgment in favor of the District of Columbia. We affirm.

### I. The Factual Background

Michael and Amy Tucci have lived at 3060 Grant Road, N.W., in the District of

Columbia since August 2002. Their home faces Grant Road, but all of the neighboring houses abutting Grant Road face adjacent streets. Thus, they own the only house with an address on the 3000 to 3200 blocks of Grant Road.

The Tuccis complain that the neighbors "take their refuse and open the gate to the backs of their property, walk on to the public space [on Grant Road] and dump their refuse." Even though trash is regularly collected, their neighbors leave trash cans in the public space all week long instead of only during times designated for trash collection. They allege that "structures" and compost bins have been erected on the public right-of-way. Rats and other vermin have been seen along Grant Road, and the Tuccis have "rat tunnels" in their yard. The Tuccis do not allege that any trash or other items have encroached upon their private property, and they do not contend that the District has left its own trash or other items in the public space.

They do claim that Grant Road is "overgrown with vegetation to such an extent that it is impossible to travel the road without damage to vehicles from the overgrowth." The overgrown vegetation has scratched the Tuccis' vehicles on either side. Moreover, the roadbed is in disrepair due mainly to erosion caused by the lack of gutters. "As a result, debris, silt and vegetation are deposited along the street and large gulleys have formed on either side of the pavement due to lack of adequate drainage." They have had "at least ten flat tires," resulting in "hundreds ... if not thousands of dollars" in replacement tires. In sum, the Tuccis assert that Grant Road looks more like an alley than a street.

Appellants have made numerous complaints to the Department of Public Works ("DPW") about the conditions on Grant Road. DPW has responded by issuing citations and fining neighbors for placing trash containers out on the wrong day or at the wrong time and for allowing vegetation to intrude on public space. DPW has assured the Tuccis that its enforcement efforts will continue. In the Tuccis' view, however, "the District's decisions regarding enforcement [have been] clouded by a misunderstanding of the facts." They assert that the District has not enforced the regulations "to the extent required by law."

At least part of the Tuccis' dissatisfaction with the District's enforcement efforts derives from a fundamental disagreement about where their neighbors' private property ends and the public space begins. The Tuccis assert "that Grant Road is a *bona fide* district street and that the right-of-way is thirty-three feet wide." Utility poles are located within that space, however, and the paved roadbed is approximately sixteen feet wide. In memoranda to Mr. Tucci, DPW has referred to the "telephone and light posts [as] designat[ing] where the public space begin[s] in the alley[;] the area between the posts should show the correct width of the alley (public space)."[1]

1. The trial court noted:

The Court understands that initially the District may have been under the impression that the property in question was private property. Plaintiffs have tendered a survey prepared at their expense that allegedly shows that the area in question is within the right of way. Although the District asks the Court not to consider the survey and affidavit of plaintiffs' expert, because they were produced late and defendant has not had an opportunity to respond to the survey, for purposes of these motions, the Court accepts plaintiffs' proffer that the trash, debris and structures have been placed on a bona fide public street as opposed to private property.

The Tuccis assert that they have suffered substantial and unreasonable interference with the use and enjoyment of their private property. They can no longer entertain guests as they please, and the value of their property is diminished, although they concede it is worth more than the price they paid.

## II. The Procedural Background

The Tuccis filed a two-count complaint accusing the District of Columbia of "Maintenance of a Public Nuisance" and "Refusal to Enforce Municipal Regulations and Other Laws." They prayed "for all damages incurred as a result of the [District's] maintenance of a public nuisance on the Grant Road right-of-way in an amount to be proven at trial, but in no event less than the difference in the market value of [the Tuccis'] property situated adjacent to a public nuisance as opposed to a properly maintained city street...." They also sought an injunction requiring the District to "enforce the municipal regulations and other laws with respect to the Grant Road right-of-way...."

Both parties moved for summary judgment. With respect to the nuisance claim, the trial court distinguished *District of Columbia v. Fowler*, 497 A.2d 456 (D.C. 1985), the case on which the Tuccis principally rely, noting that the District did not create the nuisance in this case but allegedly allowed it to be maintained. Under those circumstances, the court reasoned, the Tuccis were required, but had failed, to "show some type of common law tort such as negligence...." *See B & W Management, Inc. v. Tasea Investment Co.*, 451 A.2d 879 (D.C.1982).

Even if the Tuccis had claimed the District was negligent, the city government

"is immune from suit under the doctrine of sovereign immunity.... [W]hether to prosecute or to enforce a regulation is a discretionary, as opposed to ministerial decision, involving many policy considerations for which the municipality is immune." The trial court also noted that under the public duty doctrine the District "has no duty to enforce the public space and solid waste regulations let alone a special duty to enforce them at plaintiffs' direction or for plaintiffs' benefit." Similarly, "the District's decisions as to which streets to repave or where to add curbs are clearly discretionary decisions for which the city is immune." Moreover, "there is no private right of action in the 'Litter Control Administration Act[,]' which makes the issuance of tickets for violation of the act discretionary." For these reasons, the court denied the motion filed by the Tuccis and granted summary judgment in favor of the District.

## III. Standard of Review

■ "In reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion." *EastBanc, Inc. v. Georgetown Park Associates II, L.P.*, 940 A.2d 996, 1001 (D.C. 2008) (quotation marks and citation omitted). "We therefore must determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. We view the record in the light most favorable to the non-moving party." *National Association of Postmasters of the United States v. Hyatt Regency Washington*, 894 A.2d 471, 474 (D.C.2006) (quotation marks

---

We likewise assume, for the purposes of this decision, that the disputed area is part of the public right-of-way. We offer no opinion on

whether the Tuccis have properly established that fact.

and citation omitted). "In order to avoid summary judgment, there must be some 'significant probative evidence tending to support the complaint' so that a reasonable fact-finder could return a verdict for the non-moving party." *Lowrey v. Glassman,* 908 A.2d 30, 36 (D.C.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).[2]

## IV. The Request for Injunctive Relief

■ The Tuccis ask only for injunctive relief with respect to their claim under the Litter Control Administration Act ("LCA"). In a case where the plaintiffs similarly sought only an injunction, we held that "[t]he actions of government agencies are normally presumed to be subject to judicial review...." *District of Columbia v. Sierra Club,* 670 A.2d 354, 358 (D.C.1996) (internal quotation marks omitted).[3] Nevertheless, this presumption falls away in two circumstances: (1) where the legislature commits the challenged action entirely to agency discretion; and (2)

where a statute precludes review, either explicitly or implicitly. *Id.* (citing *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)).

■ In *Sierra Club,* we acknowledged that "[t]he determination whether and when to institute enforcement proceedings against a specific individual is a core executive responsibility which may reasonably be viewed as having been committed to agency discretion so as to preclude substantive judicial review." 670 A.2d at 360; *see also Hall v. Williams,* 738 A.2d 262, 265 (D.C.1999) ("It has long been the case that prosecutorial decisions are discretionary...."). Here, the Tuccis ask the courts to order more robust enforcement of the LCA against their neighbors, extending to all portions of the right-of-way. But such enforcement action is a core executive function committed to the discretion of the DPW, meaning that judicial review is precluded. *See J.C. & Associates v. District of Columbia Board of Appeals & Review,* 778 A.2d 296, 308 (D.C.2001) ("petitioner had no legal right to require

---

**2.** The Tuccis incorrectly suggest that the standard of review requires that their "well ple[ ]d allegations [be] taken as true." However, the District moved for summary judgment, meaning that the Tuccis could not rely on the allegations in their pleadings; they were required to proffer evidence to support each element of their claims. *See Kibunja v. Alturas, L.L.C.,* 856 A.2d 1120, 1128 (D.C.2004) ("The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations contained in its pleadings, but must set forth 'specific facts showing that there is a genuine issue for trial.'" (quoting *Potts v. District of Columbia,* 697 A.2d 1249, 1251 (D.C.1997) (other citation and quotation marks omitted)); *Musa v. Continental Ins. Co.,* 644 A.2d 999, 1002 (D.C. 1994) ("Mere conclusory allegations on the part of the non-moving party are insufficient to stave off the entry of summary judgment.").

**3.** The District invites us to apply the analysis in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080,

45 L.Ed.2d 26 (1975), and to hold that the second count of the Tuccis' complaint fails because no implied private right of action exists under the Litter Control Act. We have, in fact, applied *Cort* in a case where the plaintiff sought damages from the District. *See Coates v. Elzie,* 768 A.2d 997, 1001 (D.C. 2001) ("The burden is on Coates to demonstrate that, in spite of the absence of any explicit authorization, the D.C. Council intended to imply a right to sue for damages for violations of the [statute]."; applying *Cort* analysis and concluding that the Lorton Regulations Approval Act did not create an implied cause of action for damages against prison warden). By contrast, in *District of Columbia v. Sierra Club,* 670 A.2d 354, 359 (D.C.1996), we disagreed "with the District's contention that *Cort v. Ash* ... provides the proper analytical framework for determining whether the Sierra Club may maintain this action [for equitable relief]." Because this count of the complaint seeks injunctive relief, we apply the analysis used in *Sierra Club.*

the [Building and Land Regulation Administration] to take action under the Unsafe Structures Act, even if petitioner could show before the [District of Columbia Board of Appeals and Review] that such action was objectively warranted under the circumstances [because] exercise of this enforcement authority is committed to executive discretion").

The Tuccis resist this conclusion, arguing that enforcement of the LCA is not discretionary. In their view, "[t]he D.C. City Council mandated that the Mayor ... enforce the Act and used the word 'shall.'" See D.C.Code § 8–802 (2008 Supp.) ("The Mayor of the District of Columbia ... shall enforce the District of Columbia Solid Waste Management and Multi–Material Recycling Act of 1988...."). But this type of language is no different in kind from that found in many provisions of criminal law. See, e.g., D.C.Code § 1–1001.08(b)(4) (2001) (prosecution of unauthorized circulators of petitions; "Violations of this section shall be prosecuted in the name of the District of Columbia by the Corporation Counsel of the District of Columbia."); D.C.Code § 3–608(a) (2001) (prosecution of any person who holds, engages, or participates in unlicensed boxing, wrestling, or martial arts exhibitions; "Such cases shall be prosecuted by the Corporation Counsel of the District of Columbia in the Superior Court of the District of Columbia."); D.C.Code § 10–503.18(c) (2001) (unlawful conduct on Capitol grounds; "Violations of this part ... shall be prosecuted by the United States Attorney or his assistants in the name of the United States."). No one would seriously argue that the use of the term "shall be prosecuted" in these statutes requires

the Attorney General for the District of Columbia (formerly the Corporation Counsel) or the United States Attorney to prosecute each and every violation of these statutes brought to his or her attention. Similarly here, the words "the Mayor ... shall enforce" allocate responsibility—they do not strip the Mayor of discretion in undertaking enforcement action.

Alternatively, the Tuccis characterize the District's actions as "ministerial" because "[t]he agency decided to undertake enforcement action and has proceeded, albeit incorrectly." According to appellants, the District had already exercised its discretion in favor of enforcement. From that point on, they assert, the District's actions were merely ministerial: "Once it was determined that a citation should issue, it must issue in accordance with the regulatory requirements...." We previously have rejected a similar attempt to blur the distinction between discretionary and ministerial functions by "isolating each component of a decision...." Aguehounde v. District of Columbia, 666 A.2d 443, 450 (D.C.1995) (concluding that decision on timing of traffic light intervals was discretionary, not ministerial, and rejecting argument "that, to establish immunity, the government must produce evidence that 'social, political or economic considerations entered into the timing of the clearance interval at Wisconsin and Fessenden'"); see id., quoting Smith v. Johns–Manville Corp., 795 F.2d 301, 308 (3d Cir.1986) ("The position that agency decisions can be broken down into component parts is fundamentally at odds with the [Supreme] Court's teaching in Dalehite [v. United States, 346 U.S. 15, 35–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)]....").[4]

4. In Dalehite, the Supreme Court decided whether the Federal Tort Claims Act waived sovereign immunity for the government's manufacturing and transporting of fertilizer.

Holding that the Act did not waive immunity for discretionary functions, the Court noted that a " 'discretionary function or duty' ... includes more than the initiation of programs

This iteration of the Tuccis' argument is simply a complaint about the *level* or *extent* of enforcement activity undertaken by the District. They contend that the District should expand its field of operations to include all portions of the public right-of-way, as shown on their survey. But these are decisions about "whether and when to institute enforcement proceedings against a specific individual," *Sierra Club,* 670 A.2d at 360, and they are committed to agency discretion. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 819–20, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind."); *Barron v. Reich,* 13 F.3d 1370, 1376 n. 3 (9th Cir.1994) ("[A] decision about the *extent* of enforcement to be undertaken in a given case is also likely to be discretionary." (emphasis in original)); *Gillis v. United States Dep't of Health & Human Services,* 759 F.2d 565, 576 (6th Cir.1985) ("The mechanism by and extent to which HHS 'monitors' as well as 'enforces' compliance fall squarely within the agency's exercise of discretion.").

We similarly are unpersuaded by the Tuccis' reliance upon three decisions of the United States Court of Appeals for the District of Columbia Circuit which supposedly demonstrate that DPW's enforcement decisions are subject to judicial review.[5] In each of these cases, the court construed and applied *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), which recognized a presumption that an agency's decision not to take enforcement action is immune from judicial review. *Id.* at 832, 105 S.Ct. 1649. The Tuccis focus upon some of the discussion in those opinions, but ignore their actual holdings.

In *New York State Department of Law v. Federal Communications Commission,* the court observed that, "in some circumstances, an otherwise nonreviewable decision about initiating an enforcement action becomes reviewable once the agency undertakes the action." 299 U.S.App. D.C. 371, 376, 984 F.2d 1209, 1214 (1993). But this quotation obviously does not state a categorical rule, and the present case is nothing like the circumstances described there. Moreover, when an agency has exercised coercive power over an individual, it is one thing to recognize that person's right of judicial review to test whether the agency has exceeded its statutory powers. *Chaney,* 470 U.S. at 832, 105 S.Ct. 1649. It is a much different proposition to allow third parties to complain that the enforcement against their neighbors has not been vigorous enough.

The court's decision in *New York State Department of Law* actually supports the conclusion that the District's enforcement decisions are not reviewable. The court *held* "that the FCC's decisions about the initial scope of the enforcement action and its decision to enter into the Consent Decree are committed to the agency's nonreviewable discretion...." 299 U.S.App. D.C. at 373, 984 F.2d at 1211. *See also id.* at 377, 984 F.2d at 1215 ("Even had the FCC completed adjudication of these overcharges, it would have been free to decide, at its discretion, not to collect every dollar

and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." 346 U.S. at 35–36, 73 S.Ct. 956.

**5.** In addition to being readily distinguishable, these decisions, decided after February 1, 1971, are not binding upon us. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

to which it was entitled."); *id.* at 379, 984 F.2d at 1217 ("[W]e decline to second-guess the agency's choices concerning the scope of this enforcement action.").

■ In *Robbins v. Reagan,* 250 U.S.App. D.C. 375, 780 F.2d 37 (1985), the court reviewed a decision of the federal government to close a federally-owned building which had been used as a homeless shelter. This decision rescinded a previous commitment "to convert the facility into a model shelter," *id.* at 377, 780 F.2d at 39, and the court emphasized the difference between a decision to refrain from taking enforcement action and "an agency's decision to rescind a commitment." *Id.* at 385, 780 F.2d at 47. *Robbins* does not support the Tuccis' quest for judicial review. *Baltimore Gas & Electric Co. v. Federal Energy Regulatory Comm'n,* 346 U.S.App. D.C. 265, 252 F.3d 456 (2001), recognized "the general rule that an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is committed to its absolute discretion," *id.* at 268, 252 F.3d at 459, and held that "FERC's decision to settle its enforcement action against Columbia was within the agency's nonreviewable discretion." *Id.* at 270, 252 F.3d at 461. None of these decisions, as applied to the facts of this case, rebuts the presumption against reviewability recognized in *Chaney* and *Sierra Club.*[6]

For all these reasons, the Tuccis were not entitled to an injunction, and the Superior Court properly granted summary judgment on this count of their complaint.

## V. Sovereign Immunity and the § 12–309 Notice

Before we discuss the Tuccis' claim for damages, we reject an argument they raise in passing. It is undisputed that the Tuccis complied with D.C.Code § 12–309 (2001) by giving the District timely notice of the circumstances about which their lawsuit complains. They mistakenly assert, however, that because they "filed a tort claim against the District in accordance with [§ 12–309,] there is no basis to claim that the District is immune from [their] tort claims herein." This argument reflects a misunderstanding of the nature and purpose of § 12–309.

■ Section 12–309 provides that "[a]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage . . . ."

6. We reject the Tuccis' argument that we may exercise judicial review in this case because the District misunderstood "the location of the public/private property line" and its "decisions regarding enforcement [thus] were clouded by a misunderstanding of the facts." *See Baltimore Gas & Electric Co. v. Federal Energy Regulatory Comm'n,* 346 U.S.App. D.C. 265, 268–69, 252 F.3d 456, 459–60 (2001) (suggesting that presumption of nonreviewability may be overcome "where the agency refuses 'to institute proceedings based solely on the belief that it lacks jurisdiction'" (quoting *Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. 1649)). As the court in *Baltimore Gas* acknowledged, 346 U.S.App. D.C. at 269 n. 2, 252 F.3d at 460 n. 2, the Supreme Court did not endorse, but merely noted the possibility of, this exception to the general rule against reviewability. *See Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. 1649. We do not believe the location of the property lines along Grant Road is the type of jurisdictional issue that the Supreme Court had in mind. If we were to exercise review in these circumstances, future plaintiffs too readily would claim that a jurisdictional issue was presented because the agency's decisions were "clouded by a misunderstanding of the facts."

As we will explain at more length below, nothing in the plain language of the statute purports to waive sovereign immunity if the required notice has been given.

■ Congress enacted what is now § 12–309 in 1933,[7] at least partially in response to the decision in *District of Columbia v. Leys*, 62 App. D.C. 3, 5, 63 F.2d 646, 648 (1933) (on rehearing). *See Brown v. United States*, 239 U.S.App. D.C. 345, 348, 742 F.2d 1498, 1501 (1984) (en banc) (explaining link between the statute and the *Leys* decision). In *Leys*, the court noted that "the District of Columbia was hampered in its defense by the lapse of time between the injury and the suit, during which no claim was made or notice given of the alleged injury[,]" and it recommended that the legislature remedy the problem. 62 App.D.C. at 5, 63 F.2d at 648. Instead of shortening the period of limitations, Congress followed the lead of many states and municipalities by requiring a prospective plaintiff to give prompt notice of his or her claim. H.R.REP. No. 2010, 72d Cong., 2d Sess. 1, at 2 (1933).[8]

■ "[C]ompliance with the statutory notice requirement is mandatory," *Pitts v. District of Columbia*, 391 A.2d 803, 807 (D.C.1978) (citing *Hill v. District of Columbia*, 345 A.2d 867, 869 (D.C.1975)), and we have upheld the dismissal of many suits for failure to give timely or sufficient notice under § 12–309. *See, e.g., Brown v. District of Columbia*, 853 A.2d 733 (D.C. 2004) (notice untimely); *District of Colum-*

*bia v. Dunmore*, 662 A.2d 1356 (D.C.1995) (notice untimely); *Winters v. District of Columbia*, 595 A.2d 960 (D.C.1991) (notice insufficient). But § 12–309 is "purely a notice provision ... a 'condition precedent' to filing a suit against the District." *Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C.1981). It does not waive sovereign immunity in exchange for timely notice. Not surprisingly, we have found no case in the District of Columbia which rejected a defense of sovereign immunity because a plaintiff had properly filed § 12–309 notice. *See, e.g., Nealon v. District of Columbia*, 669 A.2d 685, 688–89 & n. 2 (D.C.1995) (upholding District's claim of sovereign immunity although there was no challenge to the adequacy of the § 12–309 notice).

Nevertheless, some of our language, often repeated, may be misconstrued to suggest that compliance with § 12–309 defeats a claim of sovereign immunity. *See, e.g., Snowder v. District of Columbia*, 949 A.2d 590, 600 (D.C.2008) ("Because it is in derogation of the common law principle of sovereign immunity, section 12–309 is to be construed narrowly against claimants." (internal quotations and citations omitted)); *Gwinn*, 434 A.2d at 1378 ("Section 12–309 constitutes a departure from the common law concept of sovereign immunity.");[9] *Kelton v. District of Columbia*, 413 A.2d 919, 920 (D.C.1980) ("We also affirm the dismissal of the Keltons' suit against the District for failure to meet the six-month

7. *See* Pub.L. No. 72–385, 47 Stat. 1370 (1933).

8. The purposes of the statute are: "(1) to allow the District to investigate potential claims so that evidence may be gathered while still available, for example before the relevant sidewalk is paved over or the meter cover fixed, (2) to enable the District to correct defective conditions, thus increasing public safety, and (3) to facilitate settlement of meritorious claims and resistance of frivolous

ones." *Hardy v. District of Columbia,* 616 A.2d 338, 340 (D.C.1992).

9. *Gwinn* goes on to explain that "[t]he doctrine of sovereign immunity, though limited, is still viable in the District of Columbia.... The District is immune from suit when the act complained of was committed in the exercise of a discretionary function." 434 A.2d at 1378 n. 3.

notice requirement in the District of Columbia's statutory waiver of sovereign immunity."); *District of Columbia v. World Fire & Marine Ins. Co.,* 68 A.2d 222, 225 (D.C.1949) ("The statute, being in derogation of common law rights, is to be strictly construed...."). Relying on this and similar language, some of our federal colleagues have characterized the statute as a waiver of sovereign immunity. *See, e.g., Ibrahim v. District of Columbia,* 539 F.Supp.2d 143, 148 (D.D.C.2008) ("Because the statute is a waiver of sovereign immunity, it is strictly construed in favor of the District."); *Tibbs v. Williams,* 263 F.Supp.2d 39, 43 (D.D.C.2003) (" § 12–309 represents a waiver of sovereign immunity ..."). We take this opportunity to clarify any misunderstanding created by our previous dictum.

■ Nothing in the plain language of the statute suggests that compliance with its requirements precludes a defense of sovereign immunity. A waiver of sovereign immunity must be "unequivocally expressed in statutory text." *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) ("A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text." (internal quotation marks omitted)); *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) ("limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied" (internal quotation marks omitted)); 18 E. McQuillin, The Law of Municipal Corporations § 53.02.30 (3d ed. 2003) ("A statutory waiver of immunity must be expressly made by clear and unambiguous language, and cannot be effected by implication."). Accordingly, statutes

that do waive sovereign immunity speak very clearly. *See, e.g.,* D.C.Code § 2–308.01 (2001) ("Unless otherwise specifically provided by law of the District, the District government and every officer, department, agency or other unit of the District government may not raise the defense of sovereign immunity in the courts of the District in an action based upon a written procurement contract executed on behalf of the District government."); D.C.Code § 2–412 (2001) ("the District of Columbia shall not assert the defense of governmental immunity in any suit [arising from negligent operation of vehicles by District employees]"); D.C.Code § 7–1305.13(c) (2001) ("Sovereign immunity shall not bar an action under this section."); 28 U.S.C. § 2674 (2000) ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.").

■ As our previous decisions have indicated, however, there is an undeniable connection between a statute like D.C.Code § 12–309 and the doctrine of sovereign immunity. "Notice of claim statutes ... are terms and conditions imposed by the government on the government's waiver of its immunity." *Findley v. City of Kansas City,* 782 S.W.2d 393, 396 (Mo.1990) (en banc). We have explained many times before that "written notice [under § 12–309] is a condition precedent to filing suit against the District." *Wilson v. District of Columbia,* 338 A.2d 437, 438 (D.C.1975) (holding § 12–309 constitutional). To borrow the words of a sister court, compliance with § 12–309 "is a condition precedent which, if not met, will prevent the destruction of sovereign immunity." *Lussier v. Dep't of Transpor-*

*tation,* 228 Conn. 343, 636 A.2d 808, 814 (1994). *See Brown,* 239 U.S.App. D.C. at 355, 742 F.2d at 1508 ("The District of Columbia Court of Appeals has consistently understood the notice requirement of Section 309 to be a condition placed on the partial waiver of the District's sovereign immunity."). But complying with this condition is necessary, not sufficient. A waiver of sovereign immunity must be found in some other source—a separate statute, like those quoted above, or our common law. *See Wade v. District of Columbia,* 310 A.2d 857, 860 (D.C.1973) (en banc) ("[T]he District is immune from suit only if the act complained of was committed in the exercise of a discretionary function; if committed in the exercise of a ministerial function the District must respond."). We therefore hold that the fact that a plaintiff has given timely and sufficient notice under § 12–309 does not preclude the District from raising the defense of sovereign immunity.

## VI. The Claim for Damages

The Tuccis alleged in their complaint that the "condition of the Grant Road right-of-way constitutes a substantial and unreasonable interference with the ... use and enjoyment of their property" and therefore is "a public nuisance." On appeal, however, they concede that the label "public nuisance" was "imprecise" and argue that their claim was, "in reality," a claim of private nuisance; indeed, they assert that they actually "ple[ ]d the elements of a private nuisance." Thus, we concentrate our analysis on the nature of a private nuisance.[10]

 "[A] 'private nuisance' is a substantial and unreasonable interference with private use and enjoyment of one's land ... for example, by interfering with the physical condition of the land, disturbing the comfort of its occupants, or threatening future injury or disturbance." *B & W Management, Inc. v. Tasea Investment Co.,* 451 A.2d 879, 882 (D.C.1982) (citing RESTATEMENT (SECOND) OF TORTS § 821D (1979) (other internal citations omitted)). "[T]he tort was developed, as needed, to protect use and enjoyment of land against nontrespassory interference." *Id.* (citing RESTATEMENT, § 821D cmt. a).[11]

 Nuisance law is a " 'a field of tort liability, rather than a type of tortious conduct. ... Nuisance, in short, is not a

10. The parties agree that, given the facts of this case, it makes little difference whether we treat the Tuccis' complaint about interference with their use of private property as alleging a public or private nuisance. *See, e.g., B & W Management, Inc.,* 451 A.2d at 881 ("It follows, as a general common law proposition, that when interference with private use and enjoyment of one's land is at issue, the nature and degree of 'special damage' necessary to create a private right of action for a public nuisance will be the same as the nature and degree of injury required to sustain a claim for a private nuisance.").

11. " 'A public nuisance is an unreasonable interference with a right common to the general public.' " *B & W Management, Inc.,* 451 A.2d at 881 (quoting RESTATEMENT (SECOND) OF TORTS § 821B (1) (1979)). "At common law,

the term 'public nuisance' covered a variety of minor criminal offenses that interfered, for example, with the public health, safety, morals, peace, or convenience." *Id.* (citing RESTATEMENT, § 821B cmt. b). Some examples of public nuisances include storing explosives in the middle of a city or maintaining a pond in which malarial mosquitoes are breeding. RESTATEMENT, § 821B cmt. b. The obstruction of a public highway may be a public nuisance. *Id.* Absent statutory authorization, "only governmental authorities or other representatives of the general public have standing to attack a public nuisance in court" unless a private party "can allege and prove 'special damage, distinct from that common to the public.' " *B & W Management,* 451 A.2d at 882 (quoting *Holloway v. Bristol–Myers Corp.,* 327 F.Supp. 17, 24 (D.D.C.1971)).

separate tort in itself, subject to rules of its own." *District of Columbia v. Fowler*, 497 A.2d 456, 461 (D.C.1985) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 87, at 573–74, 577 (4th ed.1971)). Liability must be based on some underlying tortious conduct, such as negligence. *Fowler*, 497 A.2d at 462; *see also District of Columbia v. Beretta*, 872 A.2d 633, 646 (D.C.2005) (en banc) (pointing out that, "[a]s an independent tort, claims of nuisance have ... not been viewed favorably by this court[,]" and citing the RESTATEMENT's conclusion that nuisance entails " 'conduct ... tortious *only if it falls into the usual categories of tort liability.*' RESTATEMENT (SECOND) OF TORTS § 821A cmt. c (1979) (emphasis added).").[12]

We therefore must look past the label "nuisance" to determine whether the neglect which the Tuccis allege provides a basis for finding the District liable for tortious conduct. As with their claim for injunctive relief, the Tuccis complain that the District failed to discharge its duty to enforce the LCA and the implementing regulations.[13] They also assert that the District has not properly maintained the roadway. As the trial court recognized, however, the District is protected by the doctrine of sovereign immunity.

Our cases describing the scope of sovereign immunity distinguish between discretionary acts and ministerial acts: "It is now settled that a District officer, and the District when sued for the acts of an officer under the theory of *respondeat superior*, are protected by sovereign immunity if the officer's acts are discretionary, but subject to liability if the acts were ministerial in character." *Powell v. District of Columbia*, 602 A.2d 1123, 1126 (D.C.1992) (other citations and quotation marks omitted); *see also District of Columbia v. Pace*, 498 A.2d 226, 228–29 (D.C. 1985). As we have discussed above, the District exercises discretion when making law enforcement decisions. "[A]bsent a special relationship creating a municipal duty to exercise care for the benefit of a

---

12. The Tuccis suggest for the first time in their reply brief that the District intentionally interfered with the use and enjoyment of their land and that a remand for further proceedings on this alternative theory is appropriate. We reject this attempt to amend the complaint on appeal and decline to remand the case. *See Gillespie v. Washington*, 395 A.2d 18, 21 (D.C.1978) (noting that the "well-established rule that a party who fails to raise an issue at trial generally waives the right to raise that issue on appeal ... applies specifically in a case of summary judgment").

13. The complaint does not allege either a nuisance *per se* or intentional or reckless conduct by the District. The Tuccis concede that they never alleged an intentional tort, but their appellate brief asserts that the "violations of municipal regulations regarding sanitation, solid waste and refuse" of which they complain "are violations of ... enumerated regulations, specifically 24 DCMR § 1000," and thus "can fairly be characterized as per se nuisances." Even if we were to consider this nuisance *per se* claim to be properly raised, *but see Gillespie*, 395 A.2d at 21, it is without merit.

The violations of which the Tuccis complain allegedly were committed by their neighbors, but they seek in this litigation to hold the District liable in damages. Thus, the viability of this claim depends on whether the doctrine of sovereign immunity applies. Moreover, we have defined a nuisance *per se* as "a structure or activity which is a nuisance at all times and under any circumstances." *Harris v. United States*, 315 A.2d 569, 572 n. 9 (D.C. 1974) (en banc) (internal quotation marks omitted). The LCA defines "nuisance" only "[f]or purposes of this chapter," D.C.Code § 8–803(a) (2001), and a violation of the implementing regulations does not, by that fact alone, constitute a common law nuisance *per se*. We have held on similar facts that violations of local ordinances do not translate into tortious conduct *per se* under the common law. *See B & W Management*, 451 A.2d at 882 n. 7 ("A zoning violation does not constitute a 'nuisance per se.' ").

particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation." *Platt v. District of Columbia*, 467 A.2d 149, 152 (D.C.1983) (internal quotation marks omitted); *see also Roberson v. District of Columbia*, 86 A.2d 536 (D.C.1952) (the District is not liable for negligence or nuisance when it fails to enforce anti-loitering regulations). No special relationship exists here. *See generally Warren v. District of Columbia*, 444 A.2d 1, 4 (D.C. 1981) (en banc) (no special relationship created when emergency dispatcher twice assures crime victims that help is on the way).

▪ In addition to faulting the District for failure to enforce the litter regulations, the Tuccis complain about the condition of the roadway. They "would like the city to install curbs and gutters and pave the road consistent with the requirements that it enforces [upon] their contractors on other adjacent city streets." They concede, however, that the roadbed has been repaved since they moved into their home. Whether to install curbs and gutters is a discretionary decision for which the District is entitled to immunity. *Pace*, 498 A.2d at 229 ("Street design falls squarely within the ambit of this definition [of discretionary acts].") In *Pace*, we agreed that "freeway improvements are discretionary in nature.... To hold otherwise would be effectively to impose a legal duty on the District to have 'state-of-the-art' streets." *Id.*

▪ The Tuccis also complain about the District's "failure to maintain" Grant Road, "the rat and other vermin infestation," [14] and the overgrowth of vegetation [15] along the road. "[T]he District does have a ministerial duty to maintain its streets and highways." *Pace*, 498 A.2d at 230. However, it "cannot be held strictly liable for its failure to maintain the alley properly." *Fowler*, 497 A.2d at 462 n. 11. The District "is not an insurer of the safety of

---

**14.** Michael Tucci testified in his deposition that the "vermin" and other animals include rats, voles, opossums, raccoon, deer, mice, and foxes. The Tuccis acknowledge that their house is near Rock Creek Park, however, and the District of Columbia does not have a general duty to keep the fauna of that federal parkland from exploring their neighborhood. "Rock Creek Park is a prized part of the District precisely because of its uniqueness in being natural woodland situated in the midst of an urban area [but it is not] isolated from the urban area surrounding it." *See Husovsky v. United States*, 191 U.S.App. D.C. 242, 248–49, 590 F.2d 944, 950–51 (1978).

Moreover, the presence of these animals, by itself, does not amount to a "nuisance ... in the legal sense." *Bernstein v. Fernandez*, 649 A.2d 1064, 1072 (D.C.1991) (infestation of rodents "did not amount to a nuisance"). Although the tenant in *Bernstein* may have suffered a nuisance in the colloquial sense, we held that she had to demonstrate tortious conduct, such as negligence, or a breach of the warranty of habitability, in order to recover damages from her landlord for the rodent infestation. *Id.* at 1072–73; *cf. Roth v. District of Columbia*, 16 App. D.C. 323, 324, 335–36 (1900) (District was liable to owner of neighboring residence for damages caused by offensive odors, "swarms of flies and vermin," and the like, only if stable used by ambulance service was maintained in a "negligent, improper, and unlawful manner"). These animals may well be attracted by the neighbors' trash or compost piles, but that fact does not establish the District's liability. Here, the District did not create or maintain the alleged nuisance, and the doctrine of sovereign immunity precludes the Tuccis from recovering damages for the District's alleged failure to perform the discretionary function of enforcing the regulations relating to litter.

**15.** The Tuccis concede that their "neighbors are responsible for maintaining [the vegetation] pursuant to city regulations," meaning that the District could issue citations for violations of the regulations. Thus this portion of their complaint is properly treated under the law enforcement analysis discussed above, and their claim is barred by sovereign immunity.

travelers upon its streets and is only required to maintain ... roadways in a reasonably safe condition." *Pace*, 498 A.2d at 230 (internal citations and quotation marks omitted).

■ Before the District may be liable for failure to maintain a roadway, it must have notice (actual or constructive) of an unsafe or dangerous condition. *Rajabi v. Potomac Electric Power Co.*, 650 A.2d 1319, 1322 (D.C.1994). "The existence of prior notice," is not enough, however; a plaintiff must demonstrate that the street is "in fact unreasonably dangerous." *District of Columbia v. Freeman*, 477 A.2d 713, 718–19 (D.C.1984). "The plaintiff has the burden of establishing that a violation of the reasonable standard of care is the proximate cause of the injury sustained." *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc); *see Fowler*, 497 A.2d 456 (city was liable for failure to maintain an alley properly after being put on notice of its defective condition, when the vibration of a loose slab of concrete in the alley caused structural damage to abutting garage and house, and all the elements of negligence were established).

■ The Tuccis aver that the "abhorrent" condition of the road has caused damage to their personal property. They complain that they have had "at least ten flat tires" since they moved to Grant Road, and have "replaced hundreds ... if not thousands of dollars worth of tires," and have had their cars "aligned much more often than you would expect based on normal wear and tear."

Damages of this type are not enough, by themselves, to show an "unreasonably dangerous" condition or negligence on the part of the District. *Cf. Williams v. District of Columbia*, 646 A.2d 962, 963 (D.C. 1992) ("[A]s a matter of law appellant could not recover because any defect was de minimis."); *Proctor v. District of Columbia*, 273 A.2d 656, 659 (D.C.1971) ("[F]rom the minor nature of that protrusion [in the sidewalk], the evidence is not sufficient to support a finding of negligence on the part of the District of Columbia."). "What is an actionable defect in the driveway, or what depressions and minor defects are sufficient to establish municipal negligence, depends upon all the circumstances of the particular case, taking into consideration the physical structure and nature of the area, its climate, the character of the street, and the kind and amount of travel at the location concerned." MCQUILLIN, § 54:84; *see also Husovsky v. United States*, 191 U.S.App. D.C. 242, 248, 590 F.2d 944, 950 (1978) ("[T]he appropriate level of inspection and maintenance of a particular roadway depends not only on the expense and burden of various maintenance programs, but also on the characteristics of the surrounding land and the roadway itself, including the type and extent of dangers posed thereto.... For instance, a seldom travelled roadway in a national forest in a rural area would require fewer inspections and a different type of maintenance than would a heavily travelled thoroughfare in an urban area." (internal citations omitted)).[16]

Given the relatively minor nature of the damage, and the complexity of the inquiry, this is the type of case where "[t]he standard of care must be established through expert testimony...." *Rajabi*, 650 A.2d at 1322; *see Katkish v. District of Columbia*,

---

**16.** It was the seclusion of their house that initially attracted the Tuccis. According to Amy Tucci, the "very minimal traffic" on Grant Road is "actually one of the things that was so appealing about the house." "The road actually gets more pedestrian traffic than it does vehicular traffic," and the Tuccis are "really the only people that need to use Grant Road as an entrance and exit."

763 A.2d 703, 706 (D.C.2000) ("[T]he standard of reasonable care and maintenance of a dead and leaning tree by a municipality, at least in the non-emergency situation presented here, are beyond the ken of the average person"); *Freeman*, 477 A.2d at 719 (expert testimony required to show "whether a painted crosswalk is sufficient to render a particular intersection reasonably safe [because that] is a determination essentially technical in nature, based upon an expert evaluation of vehicular and pedestrian traffic patterns, design feasibility, cost effectiveness, and related variables"). Thus, although a minor portion of their claim for damages is not precluded by the doctrine of sovereign immunity, the grant of summary judgment was proper because the Tuccis failed to proffer evidence to establish the applicable standard of care. *See Brown v. George Washington University*, 802 A.2d 382, 385 (D.C.2002) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (internal quotation marks and citations omitted)).

For these reasons, the judgment of the Superior Court is hereby

*Affirmed.*